STATE OF NORTH CAROLINA v. LYNETTE MAC CARDWELL

No. COA98-997

(Filed 15 June 1999)

### 1. Evidence— driving while impaired—blood plasma alcohol testing—results admissible

The trial court did not abuse its discretion in a driving while impaired prosecution by admitting into evidence the results from a blood plasma alcohol test performed using an ACA Star Analyzer. The court's findings reveal its consideration of the Analyzer's general acceptance in both the medical and forensic fields, the fact that the Analyzer is an established technique for measuring alcohol concentration, the professional backgrounds of the individuals who operate and/or rely on the Analyzer, and defendant's particular circumstances.

STATE v. CARDWELL

[133 N.C. App. 496 (1999)]

2. **Motor Vehicles— driving while impaired—blood plasma alcohol level— conversion ratio—reliable**

The trial court did not abuse its discretion in a driving while impaired prosecution by finding that a ratio of 1 to 1.18 was reliable to convert plasma-alcohol concentration to its blood-alcohol equivalent. The court received evidence that 1 to 1.18 is the generally accepted conversion ratio, that numerous studies have found that ratios between 1 to 1.15 and 1 to 1.21 to be accurate, and the court's findings reveal consideration of the professional background of the expert employing the 1 to 1.18 ratio. Furthermore, defendant's blood-alcohol level was above the legal limit even using the highest conversion ratio.

3. **Evidence— driving while impaired—blood plasma alcohol level—not unduly prejudicial**

The trial court did not abuse its discretion in a driving while impaired prosecution by determining that the probative value of the results of a blood plasma alcohol test was not substantially outweighed by the risk of prejudice. The test results were highly probative of whether defendant was driving while impaired, the court determined that the Analyzer results were reliable, the test results lacked emotional content, and both sides were allowed to present explanatory expert testimony to reduce the risk of misleading the jury.

4. **Evidence— character for truthfulness impugned—no prejudice**

There was no prejudicial error in a prosecution for driving while impaired where a trooper testified that defendant had told him that she had drunk a little Schnapps and the State was allowed to elicit testimony from the same trooper that he later heard defendant state that she had drunk nothing. Although defendant's character for truthfulness was not pertinent to the charge of driving while impaired, the State's elicitation of this testimony did not present any information to the jury which defendant did not present herself through her own witnesses.

5. **Sentencing— driving while impaired—probation—longer than statutory period—no findings**

The trial court erred when sentencing defendant for driving while impaired by sentencing her to a longer probation period than provided in N.C.G.S. § 15A-1343.2 without making the required finding.

STATE v. CARDWELL

[133 N.C. App. 496 (1999)]

Appeal by defendant from judgment dated 19 February 1998 by Judge Melzer A. Morgan, Jr. in Rockingham County Superior Court. Heard in the Court of Appeals 27 April 1999.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Isaac T. Avery, III, for the State.*

*Marjorie S. Canaday, for defendant-appellant.*

GREENE, Judge.

Lynette Mac Cardwell (Defendant) appeals from her driving while impaired and reckless driving convictions.

On 26 April 1997 at approximately 7:00 p.m., Defendant was involved in a two-vehicle collision. Following the collision, Defendant was taken to Moses Cone Memorial Hospital (Moses Cone) in Greensboro, North Carolina, for treatment. Defendant's treating physician at Moses Cone ordered testing of Defendant's blood for its alcohol concentration. Defendant's test results were subsequently made available to the State by the trial court upon a determination that it was necessary to the proper administration of justice.[1] On 18 December 1997, Defendant moved to suppress the results of her alcohol testing on the grounds that both the DuPont ACA Star Analyzer (Analyzer) utilized by Moses Cone to determine Defendant's plasma-alcohol concentration and the ratio used to convert her plasma-alcohol concentration to the equivalent blood-alcohol concentration are unreliable.

At the hearing on Defendant's motion, testimony was presented as to the chain of custody of Defendant's blood samples.[2] Bryan Dellinger (Dellinger), the Moses Cone medical technologist who tested Defendant's blood samples, testified as to his training and as to the proper operation of the Analyzer. Dellinger further testified that he removed Defendant's plasma from her whole blood in a centrifuge, and then tested her plasma in the Analyzer to determine its alcohol content. Defendant's plasma-alcohol concentration, according to the Analyzer, was 127 milligrams per deciliter.

Robert Milton Gay, M.D. (Dr. Gay), chief of pathology and clinical laboratory services at Moses Cone, testified during the hearing that

---

1. Defendant does not contest the trial court's decision to make her test results available to the State.

2. Defendant does not contest chain of custody.

he was familiar with the Analyzer, and that it has been in use at Moses Cone for "probably 20 years." Dr. Gay testified that the Analyzer is reliable, and that "[a] lot of hospitals use it for specific things. I would think that it would be relatively common in tertiary care medicine." Dr. Gay further testified that a combination of elevated lactic dehy- drogenase (LDH) levels and other factors could cause a false high alcohol reading on the Analyzer. Dr. Gay testified he was convinced, from a review of Defendant's medical records, that although Defendant had elevated LDH levels due to liver damage caused by the accident, no other factors were present which, combined with Defendant's elevated LDH levels, could cause a false reading. "As I mentioned, another factor is required for [a false reading] to happen, and that's an increase in lactate or lactic acid, and while there is no direct measurement of lactic acid here, there is evidence that [Defendant's] lactic acid was not increased." Dr. Gay summed up his testimony by stating that, in his opinion, nothing in Defendant's med- ical record caused him to doubt the accuracy of the Analyzer's results in this case. On cross-examination, Dr. Gay stated unequivocally that transfusions of saline, which had been administered to Defendant prior to the withdrawal of her blood samples, would not have affected the Analyzer's results.

Richard W. Waggoner, Jr., Ph.D. (Dr. Waggoner), a forensic chemist with the North Carolina State Bureau of Investigation (SBI), was permitted to testify as an expert in forensic chemistry. Dr. Waggoner explained that testing plasma for alcohol concentration results in higher readings than the testing of whole blood for alcohol concentration, and, accordingly, plasma-alcohol content must be con- verted to its equivalent blood-alcohol content to ascertain whether the alcohol concentration of an individual's blood is over the legal limit of 0.08. Dr. Waggoner testified that the SBI uses a ratio of 1 to 1.18 to convert the alcohol concentration of plasma into "whole blood results," and has used this ratio for over ten years. Dr. Waggoner stated that a 1 to 1.18 ratio is considered scientifically reli- able by other experts in the field of forensics. Approximately 90 per- cent of the published studies in journals and texts report accurate conversion ratios ranging from 1 to 1.15 through 1 to 1.21, although Dr. Waggoner was aware of one study which found one individual to have a conversion ratio of 1 to 1.59, and of one study which found one individual to have a conversion ratio of 1 to 1.35. Dr. Waggoner believed these figures to be unreliable "outliers" based on his review of numerous studies, encompassing a total of approximately one thousand individuals. Using the SBI's conversion ratio of 1 to 1.18 to

convert Defendant's plasma-alcohol concentration of 127 milligrams per deciliter, Dr. Waggoner testified that Defendant's blood-alcohol concentration would be equivalent to 0.107. Using a conversion ratio of 1 to 1.21, the highest ratio Dr. Waggoner considered to be reliable, Defendant's blood-alcohol concentration would be equivalent to 0.105. Even using a conversion ratio of 1 to 1.35, a ratio Dr. Waggoner considered unreliable, Defendant's blood-alcohol concentration would be equivalent to 0.094.

James Woodford, Ph.D. (Dr. Woodford), a chemist, testified for Defendant as an expert in "medicinal and forensic chemistry." In Dr. Woodford's opinion, the Analyzer is not a reliable method of determining blood-alcohol concentration. Dr. Woodford testified that, in his experience with drug-testing for federal employment, alcohol concentration results obtained from enzyme tests such as the Analyzer may not serve as the basis for hiring or firing decisions unless the results are verified by gas chromatography testing. Dr. Woodford also believed the Analyzer to be unreliable because it tests for a reaction which can be caused by alcohol, but which can also be caused by other factors, including enzymes. Dr. Woodford opined that the damage to Defendant's liver could have released enzymes which would affect the Analyzer's reading. In addition, Dr. Woodford believed the Analyzer's results were unreliable in this case because Defendant had been given at least two units of saline solution, which is mostly water, prior to having her blood taken. Dr. Woodford testified that alcohol is attracted to water, and the water in the saline solution would have absorbed alcohol stored in Defendant's muscle tissue, resulting in higher levels of alcohol in Defendant's bloodstream. Dr. Woodford disputed the 1 to 1.18 conversion ratio utilized by the SBI, stressing that most published studies setting a ratio to convert plasma-alcohol content to blood-alcohol content apparently test healthy individuals (although he conceded that at least one of the relied-upon studies tested blood received from emergency room patients). Accordingly, Dr. Woodford felt that the conversion ratio of individuals in the studies could not accurately be applied to individuals, like Defendant, suffering from trauma.

Following the presentation of testimony, the trial court heard arguments from Defendant and from the State, noting that "[t]he State has the burden" of showing that the Analyzer is a reliable mechanism for testing alcohol concentration and that 1 to 1.18 is a reliable conversion ratio. The trial court subsequently made the following pertinent findings of fact as to the reliability of the Analyzer and the 1 to 1.18 conversion ratio:

6. . . . The [Analyzer] is of very good reliability. Similar instruments have been in use for over 20 years. This model is in common use in tertiary care hospitals throughout the United States [and] . . . has gained general acceptance among metropolitian [sic] hospitals in North Carolina and hospitals throughout the United States. The principles underlying this instrument are scientifically valid. It is a reliable scientific instrument. . . .

. . . .

12. . . . It is generally recognized and accepted that an alcohol reading in plasma is higher than an alcohol reading in whole blood, so the reading must be converted to whole blood alcohol level for court purposes. The ratio used by the SBI is a conservative ratio. The ratio is 1 to 1.18. It has been used for at least 11 years by the North Carolina State Bureau of Investigation forensic laboratory. The ratio chosen by the SBI laboratory is a conservative ratio, at the mid-point in values in the recognized scientific and technical literature. This ratio is based on the published findings. . . . The 1 to 1.18 ratio is a reliable ratio. The 1 to 1.18 ratio is generally accepted in the field of forensic chemistry. The 1 to 1.18 ratio is considered sufficiently reliable by other experts in the field of forensic chemistry. The ratio is an established and respected ratio in the forensic community [and] is scientifically valid. . . . A plasma alcohol concentration here of 127 milligrams per deciliter, when the 1 to 1.18 ratio is used, gives a whole blood alcohol concentration reading of .10[7] per one hundred milliliters of blood. . . . Using 1 to 1.35, the result would be .094. Dr. Waggoner's education and experience well fit him for explaining the conversion factor and the result to the trial jury.

Considering factors specific to Defendant which could have affected the reliability of her Analyzer results, the trial court found:

7. . . . An elevated LDH reading standing by itself, as a single factor, would not result in a false high reading. Other body chemistry readings did not indicate that elevated LDH would give a false positive reading. . . . [T]here was no credible evidence that elevated LDH skewed the result of the plasma alcohol test. . . .

8. . . . Here there were body chemistry readings which indicate that lactic acid was not increased (high). . . .

9. . . . [T]he State's medical expert, Pathologist Dr. Gay, was aware that the [D]efendant received two units of saline solution.

This fact did not cause him to be suspicious of the test result. The Court does not find it persuasive that the [D]efendant's plasma alcohol concentration would be increased because the [D]efendant was given saline solution before blood was drawn.

Finally, balancing the probative value of Defendant's Analyzer test results against the prejudicial effect of this evidence, the trial court found:

15. Engaging in the balancing involved under Rule 403 of the North Carolina Evidence Code, the Court determines that the probative value of the figure arrived at by converting plasma blood alcohol to whole blood alcohol concentration is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or any other matter of concern under Rule 403.

Based on these findings, the trial court denied Defendant's motion to suppress the Analyzer test results.

At trial, the three individuals who had witnessed the accident testified for the State. Jessica Elizabeth Sola (Sola) testified that Defendant's vehicle "crosse[d] in my lane traveling in the other lane, and as I was slowing down I started to pull off the side of the road and she come over into my lane and hit me." Brenda Brown (Brown) and her son, Joshua Horn (Horn), were a few car-lengths ahead of Sola's vehicle in the same lane of travel. Brown testified:

[Defendant's vehicle] run off on the curve, and when it came back on [the road] it came over into our lane of traffic and kind of like zig-zagged back and forth after that, and I told my son [who was driving Brown's vehicle] to pull the car over. I said, "I think she is going to wreck." And then I said, "She may hit us," and we pulled over.

Brown watched as Defendant's vehicle crossed into Sola's lane of travel and hit Sola's vehicle. Horn testified:

[Defendant's vehicle] had come around the curve and I noticed it hit the—it went off the road toward the right-hand side and threw up a cloud of dust . . . then the car was out of control, and as it come closer to us it zig-zagged like in and out. It come in our lane of travel and went back in its lane past us. Once it passed us, it zig-zagged back into Ms. Sola's lane and then they collided.

Horn went to Defendant's vehicle to check on her, and smelled an odor of alcohol about Defendant's person.

After the accident occurred, Benjamin Franklin Archer, IV (Archer), an emergency medical technician, arrived at the scene. He climbed into the back seat of Defendant's vehicle to attempt to stabilize Defendant's head and neck. Archer testified that he smelled a moderate odor of alcohol coming from Defendant's breath.

When Defendant arrived at Moses Cone following the accident, Jamie Blue (Blue), an emergency room staff nurse, Joseph Perez (Perez), a registered nurse, and DeAudra Belizone, a clinical laboratory technician, were in Defendant's presence for an extended period while performing their duties. Each testified that they detected an odor of alcohol coming from Defendant's breath. In addition, Blue and Perez testified that Defendant stated she "had been drinking at the lake."

Trooper Mike Murphy (Trooper Murphy) of the North Carolina Highway Patrol also spoke with Defendant that evening at Moses Cone, and noticed "a moderate odor of alcohol" coming from Defendant's breath. Trooper Murphy testified that when he returned to Moses Cone two days later, "[Defendant] just made a voluntary statement to me that she didn't feel like she was impaired, that she had drank some Schnapps at Dr. Mitch Bloom's residence at Belews Creek; however, it wasn't that much." Trooper Murphy was then allowed to testify, over Defendant's objection, that he had subsequently heard Defendant state she "had drank nothing" prior to the wreck.

After Dellinger and Dr. Waggoner offered substantially the same testimony as they had offered during the pretrial hearing on Defendant's motion to suppress, the State rested its case-in-chief.

Defendant did not testify in her own behalf. Four friends and/or acquaintances of Defendant each testified that they had engaged in brief conversations with Defendant around 5:00 p.m.; none noticed an odor of alcohol. Carolyn Cardwell (Cardwell), Defendant's mother, testified that she and Defendant spoke briefly "near seven o'clock" before Defendant left to attend a banquet. Cardwell noticed no odor of alcohol on Defendant's breath. Amy Baitz (Baitz), one of the first passers-by following the accident, applied a towel to the laceration on Defendant's forehead until medical personnel arrived, and noticed no odor of alcohol. Jodie Allen Shelton (Shelton) rode at Defendant's feet in the ambulance to Moses Cone and did not smell any odor of alcohol about Defendant. Cuff Watson Hopper (Hopper), a county rescue squad volunteer and friend of Defendant, also rode with

Defendant in the ambulance. Hopper testified that he did not notice any odor of alcohol. After Dr. Woodford offered substantially the same testimony as he had offered during the pretrial hearing on Defendant's motion to suppress, the defense rested.

On rebuttal, Ronald C. Hill, Jr. (Hill), a paramedic, testified for the State. Due to his sinus condition, Hill could not smell anything on 26 April 1997. While riding in the ambulance with Defendant on the way to Moses Cone, Hill asked Hopper if he smelled any odor of alcohol about Defendant's person, and Hopper nodded affirmatively. Phil Mizelle (Mizelle), also a paramedic, saw Hopper the day after the accident. Mizelle was allowed to testify, solely for the purpose of impeaching Hopper, that Hopper told him alcohol had been involved in the wreck and Defendant had been drinking. Dr. Gay also testified on rebuttal, offering substantially the same testimony as he had offered during the pretrial hearing on Defendant's motion to suppress.

After closing arguments, the trial court instructed the jury that it could find Defendant guilty of driving while impaired if it found beyond a reasonable doubt that she was driving a vehicle on a highway in this State and "that at the time the [D]efendant was driving that vehicle she either (a) was under the influence of an impairing substance . . . [or (b)] had an alcohol concentration of .08 or more grams of alcohol per 100 milliliters of blood." The jury returned verdicts of guilty of driving while impaired and reckless driving. For the driving while impaired conviction, the trial court sentenced Defendant to a twelve-month suspended sentence. Defendant was placed on supervised probation for one year and unsupervised probation for four years, and was required to serve an active sentence of sixty days as a condition of her probation. For the reckless driving conviction, the trial court entered an additional thirty-day suspended sentence. For that conviction, Defendant was placed on supervised probation for twelve months and unsupervised probation for forty-eight months.

The issues are whether: (I) the Analyzer constituted reliable scientific evidence in this case; (II) the State improperly elicited testimony as to Defendant's character for truthfulness; and (III) the trial court failed to make sufficient findings at Defendant's sentencing.

I

**[1]** Expert testimony based on a scientific method of proof is generally admissible if the expert's "scientific, technical or other specialized knowledge will assist the trier of fact." N.C.G.S. § 8C-1, Rule 702(a) (Supp. 1998). In determining whether a scientific method of proof will assist the trier of fact in a given case, the trial court must determine whether the method is reliable. *State v. Pennington*, 327 N.C. 89, 98, 393 S.E.2d 847, 852 (1990). The trial court may take judicial notice that a scientific method of proof is reliable; however, in cases where the scientific method of proof at issue is a relatively new one, reliability "is usually established by expert testimony." *Id.*; *State v. Bullard*, 312 N.C. 129, 148, 322 S.E.2d 370, 381 (1984); 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 113 (5th ed. 1998) [hereinafter *Brandis & Broun on Evidence*]. The general acceptance of a particular method by the scientific community may be one indicator of its reliability; however, a lack of general acceptance is not dispositive. *Pennington*, 327 N.C. at 98, 393 S.E.2d at 852; *Bullard*, 312 N.C. at 145, 322 S.E.2d at 379. Other factors the trial court may consider in determining the reliability of an expert's scientific method of proof include: (1) the expert's professional background; (2) independent research conducted by the expert; (3) the use of established techniques; and (4) explanatory testimony (including, for example, the "use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith' "). *Pennington*, 327 N.C. at 98, 393 S.E.2d at 853 (quoting *Bullard*, 312 N.C. at 151, 322 S.E.2d at 382); *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94, 125 L. Ed. 2d 469, 482-83 (1993) (noting that some of the "[m]any" possible factors for consideration include empirical testing of the new scientific technique, peer review and publication, the known or potential rate of error, and general acceptance by the scientific community). We review the trial court's reliability determination under an abuse of discretion standard. *State v. Spencer*, 119 N.C. App. 662, 664, 459 S.E.2d 812, 814, *disc. review denied*, 341 N.C. 655, 462 S.E.2d 524 (1995); *cf. Kumho Tire Co., Ltd. v. Carmichael*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 4179 (1999) (noting that federal rule 702, which is, in relevant part, identical to our Rule 702, vests "discretionary authority, reviewable for its abuse," in the trial court). Accordingly, we will reverse the trial court's determination on this issue "only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *See State v. Cagle*, 346 N.C. 497, 506-07, 488 S.E.2d 535, 542, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 614 (1997).

In this case, the trial court's findings reveal its consideration of the Analyzer's general acceptance in both the medical and forensic fields, the fact that the Analyzer is an established technique for measuring alcohol concentration, and the professional backgrounds of the individuals who operate and/or rely on the Analyzer. Accordingly, as the trial court's findings reflect its consideration of relevant factors for determining the admissibility of scientific evidence and are reasonably supported by the evidence presented, the trial court did not abuse its discretion in determining that the Analyzer is a reliable scientific method of proof. *See State v. Drdak*, 330 N.C. 587, 592, 411 S.E.2d 604, 607 (1992) (noting that N.C.G.S. § 20-139.1(a), which provides for one method of blood-alcohol content analysis, allows for the admission of other competent evidence, including other chemical tests, to show a defendant's blood-alcohol level).

Furthermore, the trial court's findings reveal its consideration of whether the Analyzer results, although generally reliable, were inadmissible due to Defendant's particular circumstances. *See Pennington*, 327 N.C. at 101, 393 S.E.2d at 854 ("The evidence [obtained from a reliable scientific method of proof] may be found to be so tainted that it is totally unreliable and, therefore, must be excluded."). The trial court found there was "no credible evidence that [Defendant's] elevated LDH skewed the result of the plasma alcohol test"; elevated LDH alone would not cause "a false positive reading"; there "were body chemistry readings which indicate that [Defendant's] lactic acid was not increased"; and the "saline solution administered to [Defendant] . . . did not so effect the chemistry in [Defendant's] blood plasma as to make the blood plasma alcohol reading here so unreliable as to be inadmissible." The trial court's findings reveal that its determination that Defendant's results were not so tainted as to be totally unreliable was the result of a reasoned decision; accordingly, the trial court did not abuse its discretion.

[2] Defendant also challenges the reliability of the conversion ratio used to convert her plasma-alcohol concentration to its blood-alcohol concentration equivalent. The trial court received evidence that 1 to 1.18 is the generally accepted conversion ratio in the forensic field and that numerous studies have found ratios between 1 to 1.15 and 1 to 1.21 to be accurate for the overwhelming majority of participants. The trial court's findings also reveal its consideration of the professional background of the expert employing the 1 to 1.18 ratio. Based on this evidence, the trial court found a conversion ratio of 1 to 1.18 to be reliable, and we see no abuse of discretion in this

determination based on the evidence presented in this case. In any event, even using a conversion ratio of 1 to 1.21, the highest conversion ratio deemed reliable by Dr. Waggoner based on his review of numerous studies, Defendant's blood-alcohol concentration was above the legal limit.

[3] Defendant additionally contends the results of the Analyzer should have been excluded pursuant to Rule 403 of the North Carolina Rules of Evidence. Again, we disagree. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." N.C.G.S. § 8C-1, Rule 403 (1992). "Unfair prejudice is defined as 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.'" *State v. Ferguson*, 105 N.C. App. 692, 695, 414 S.E.2d 769, 771 (1992) (quoting N.C.G.S. § 8C-1, Rule 403, official commentary). Whether to exclude evidence pursuant to Rule 403 is within the sound discretion of the trial court. *Cagle*, 346 N.C. at 506-07, 488 S.E.2d at 542.

In this case, Defendant's Analyzer results, obtained approximately an hour after her accident, are highly probative of whether she was driving while impaired. The evidence obtained and/or derived from the Analyzer, although obviously prejudicial to Defendant, is not unfairly prejudicial. The trial court determined that the Analyzer results were reliable in this case; the Analyzer test results lack emotional content; and both sides were allowed to present explanatory expert testimony to reduce the risk of misleading the jury. It follows that a decision based on these results would not have been on any improper basis. The trial court therefore did not abuse its discretion in determining that the probative value of Defendant's Analyzer results was not substantially outweighed by the danger of unfair prejudice or jury confusion.

Finally, we note that, although the trial court determined the reliability of Defendant's Analyzer test results and the 1 to 1.18 conversion ratio for admissibility purposes, it properly allowed Defendant and the State to present evidence to the jury respectively attacking and supporting the reliability of the Analyzer itself, Defendant's results on the Analyzer, and the conversion ratio utilized to determine Defendant's blood-alcohol content. *See Pennington*, 327 N.C. at 101, 393 S.E.2d at 854. The jury therefore was able to determine the appropriate weight to assign to this evidence.

II

**[4]** Trooper Murphy testified that, on 30 April 1997, Defendant told him she "had drunk a little Schnapps" prior to the accident. Then, over Defendant's objection, the trial court allowed the State to elicit testimony from Trooper Murphy that he later heard Defendant state she "had drank nothing" prior to the accident. Defendant contends this testimony was inadmissible character evidence elicited for the purpose of attacking her character for truthfulness. We agree, from a review of the transcript, that the State's only purpose in eliciting the latter statement was to impugn Defendant's credibility. The State contends this evidence was relevant and therefore admissible. Relevance is only one test for admissibility, however, and does not end the inquiry. *See, e.g.,* N.C.G.S. § 8C-1, Rule 403 (providing that relevant evidence may be excluded where it is unfairly prejudicial).

Generally, the State may not elicit evidence of the defendant's character in a criminal prosecution unless the evidence is relevant for some purpose other than proving character. *See* N.C.G.S. § 8C-1, Rule 404 (Supp. 1998); *State v. Sanders,* 295 N.C. 361, 373, 245 S.E.2d 674, 682 (1978) ("Where a defendant has neither testified as a witness nor introduced evidence of his good character, the State may not present evidence of his bad character . . . ."); 1 *Brandis & Broun on Evidence* § 88. The State is allowed, however, to rebut evidence of a pertinent character trait offered by the defendant, *see* N.C.G.S. § 8C-1, Rule 404(a)(1), and to impeach the defendant's credibility with specific instances of conduct that are probative of credibility on cross-examination of the defendant or of a witness who has testified as to the defendant's character, *see* N.C.G.S. § 8C-1, Rule 608(b) (1992).

In this case, Defendant's character for truthfulness was not pertinent to the charge of driving while impaired, *see State v. Sexton,* 336 N.C. 321, 359, 444 S.E.2d 879, 901 (defining "pertinent" in the Rule 404 context), *cert. denied,* 513 U.S. 1006, 130 L. Ed. 2d 429 (1994), Defendant did not testify and thus did not subject herself to impeachment, and, at that point in the proceedings, Defendant had not yet elicited testimony from other witnesses which would tend to show her good character. Accordingly, the trial court erred in allowing the State to elicit Trooper Murphy's testimony concerning Defendant's conflicting statement.

Error alone, however, does not result in a new trial. The defendant has the burden of showing there exists a "reasonable possibility

**STATE v. CARDWELL**

[133 N.C. App. 496 (1999)]

that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1997). In this case, Defendant pleaded not guilty, and each of Defendant's witnesses testified they had noticed no odor of alcohol on Defendant's breath. Trooper Murphy's objectionable testimony that Defendant stated she "had drank nothing" therefore supports her defense. The State's elicitation of this testimony did not present any information to the jury which Defendant herself did not present through her own witnesses. Accordingly, we are not persuaded a reasonable possibility exists that the jury would have returned a different verdict absent this error.

## III

**[5]** Lastly, Defendant contends the trial court erred in sentencing her to twelve months supervised and forty-eight months unsupervised probation on her reckless driving conviction without finding that this extended period of probation was necessary.

Section 15A-1343.2 specifies the "length of the original period of probation for offenders sentenced under Article 81B." N.C.G.S. § 15A-1343.2(d) (1997). The trial court may sentence offenders to longer or shorter periods of probation, however, if it "makes specific findings that longer or shorter periods of probation are necessary." *Id.*

In this case, the State concedes the trial court sentenced Defendant to a longer period than that provided in section 15A-1343.2 without making the required finding. Accordingly, we remand Defendant's reckless driving conviction for resentencing. The trial court may either reduce Defendant's probation to the statutory period or may enter a finding that the longer period is necessary.

Driving While Impaired: No error.

Reckless Driving: Trial—No error; Sentencing—Remand.

Judges MARTIN and McGEE concur.