* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good ground to receive further evidence or rehear the parties or their representatives. Upon review of the evidence, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee/employer relationship existed between the named employee and named employer at the times in question.
3. The employee's average weekly wage was $943.77, with a compensation rate of $512.00 per week, the maximum rate in effect on June 6, 1997.
4. The carrier on the risk is correctly named above.
5. Various medical records and other documents have been stipulated into evidence with the Pre-Trial Agreement.
 * * * * * * * * * * * EVIDENTIARY RULING
The Full Commission finds Drs. Stopford, David Savitz, Utell and Warhol qualified as expert witnesses in their respective fields as well as Drs. Carlo and Corn. Their testimony is based on reliable methodology and is relevant and useful and therefore admissible.
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 65 years of age. He had completed the sixth grade and went to work at a brickyard for approximately 15 years. On June 17, 1970, he began working for defendant-employer as a batch builder. Plaintiff worked as a batch builder for only 90 days, when he was promoted to the position of forklift operator. He remained in this position for almost 27 years until his retirement on February 27, 1997.
2. Of these twenty-seven years as a forklift operator, plaintiff spent the first 17 to 19 years hauling materials from the receiving area of the plant to the mixing area of the plant, which *Page 3 
is called the Banbury department. The materials used to make the rubber, many of which were packaged in bags and drums, were stacked on pallets. The Banbury department, which measures approximately 521,000 square feet, is separated from the rest of the Fayetteville plant by a firewall extending from floor to ceiling. There are approximately six doors, each eight by eight feet, between the Banbury department and its neighboring department. These doors usually remain open.
3. Although there was only one Banbury in operation when plaintiff began working as a forklift operator, there were nine Banburys in operation at the Fayetteville plant by the time he retired. A Banbury is a gigantic industrial sized mixer that combines together various components to form different types of tire rubber. Employees can access the machines at three different levels. The bottom level consists of the mixing chamber where an operator loads rubber components into the machine, the middle level consists of the drum where the components are mixed and the third level is where the machines' multiple exhaust fans and filters are located.
4. Each Banbury is equipped with a large electric motor that operates a fan, which in turn sucks air up a duct from the Banbury into the dust collector, which is a large room containing a number of filters.
5. James Smith, the maintenance manager in the Banbury department, testified that the dust collectors performed well and they seldom break down. However, when there are breakdowns, Banbury operators typically would not run the Banburys until the dust collectors were repaired. Mr. Smith further testified that when these rare breakdowns occur, they are top priority in the maintenance department. Mr. Smith also testified that he would regularly change the filters in the dust collectors and that changes were made in 1978 to make this process easier. William Heffernan who worked as an area manager in the Banbury department, corroborated Mr. *Page 4 
Smith's testimony and also testified that the roof of the Banbury department has dozens of exhaust fans, from one end of the roof to the other which provide ventilation in the Banbury department. The Commission finds the testimony of Mr. Smith and Mr. Heffernan credible.
6. Plaintiff's primary job duty consisted of operating a forklift to move materials from the receiving area of the plant to dump sinks located approximately six to ten feet from the Banbury, in the vicinity of the mixing chamber where the Banbury operator would then load the components into the machine. Most of these materials arrive at the receiving area of the plant packed in boxes, bags, barrels or drums. One component of tire rubber is carbon black.
7. Occasionally, during delivery, plaintiff would drop or break open one of the boxes or bags and the contents would spill, and plaintiff would have to clean up. Plaintiff stated that some of the materials used in the rubber-making process would fly into the air when the components were poured into the mixing chamber and that once in the mixing chamber, components would often be violently ejected out of the Banbury (referred to as "blowbacks"), covering the floor around the machine in two to three inches of black dust. Plaintiff stated that he would be covered in black dust at the end of each work shift and when he coughed or blew his nose, he would emit a black discharge. The Commission finds plaintiff's testimony to be credible.
8. John Butler, who was plaintiff's area manager in the Banbury department and worked at the plant for over 27 years, testified that these "blowbacks" would rarely occur and when they did, the cleaning crew would immediately clean the area. Mr. Butler also testified that it would be very rare for a forklift operator to be covered in black dust at the end of a shift. Eddie Hill, who is an area manager in the Banbury department, testified that he worked in the Banbury department for almost 18 years and only saw or heard of about 7 or 8 blowbacks. *Page 5 
9. Dewey Touchton worked as a supervisor for Defender Industries, the cleaning company retained by defendant-employer to regularly clean and maintain the Fayetteville plant. Mr. Touchton worked as a supervisor at the Fayetteville plant for approximately 9 years, from 1971-1980. He testified that the Banbury department was the dirtiest department in the plant. During his employment, Mr. Touchton had six men working solely in the Banbury department during each of the three shifts at the plant. Mr. Touchton testified blowbacks are rare and when they occurred, he would direct his men to clean up the materials immediately. Mr. Touchton also testified that his crew would regularly change the filters located in the dust collectors and that his crew did a good job of cleaning the Banbury department.
10. Once the rubber tire components are mixed, a thick rubber batter is released through a gate located near the mixing chamber. The rubber batter will either be "productive" or "non-productive." Productive rubber contains a curing agent and will harden when heated. Productive rubber batter is run through a press to create rubber slabs that are then hauled to an area in the Banbury department known as the wig-wags. In this area, the rubber slabs are placed on drying racks until they are cool enough to transport to other areas of the plant where the slabs are then transformed into tires.
11. Rubber batter that lacks a curing agent is called non-productive rubber. This term means the rubber will soften when heated. The non-productive batter is run through a pelletizer, which is attached to the Banbury. Once rubber pellets are formed, they are covered with a wet liquid, called slurry, to keep them from sticking to one another. Slurry is composed of water, clay, talcum and a defoaming agent. When cooled, the pellets are loaded into gondolas at room temperature. When filled with rubber, these gondolas are stored until the non-productive pellets are needed as a component in creating productive rubber. *Page 6 
12. As a forklift operator, plaintiff had other job duties in addition to delivering materials to the Banbury. These included hauling rubber pellets to storage and moving the rubber slabs of productive rubber to the wig-wag area for drying. Plaintiff testified that while he was performing these job functions, his forklift would become splattered with rubber product that irritated his nose, eyes and chest and caused him to cough. Plaintiff would occasionally travel outside to the back of the plant to replace his gas tank and to empty trash. When plaintiff replaced his gas tank, approximately once per week, he was required to take an air hose and blow dust off his radiator. Plaintiff testified that while emptying pellets into the dump sinks, a large cloud of slurry dust would rise and irritate his nose, eyes, and chest while causing him to cough. Plaintiff further testified that this dust would also irritate his nose, eyes, and chest and cause him to cough.
13. For the last 8 to 10 years of his employment, plaintiff trucked the wig-wags. He would use a forklift to move the cooled productive rubber slabs from the wig-wags to other locations in the plant.
14. As documented by medical records, plaintiff's smoking history is one to one and one-half packs of cigarettes per day for 50-55 years. At the hearing before the Deputy Commissioner, plaintiff's wife, Grace, testified that he smoked approximately two to two and one-half packs per day. Plaintiff testified that he began smoking when he was five or six years old when, on occasion, he would take a puff or two of a cigarette. Plaintiff stated he began smoking on a regular basis at the age of 16. When plaintiff was diagnosed with lung cancer in 1997, he reduced his smoking to one-half to one pack of cigarettes per day.
15. Plaintiff had an initial chest x-ray on June 13, 1991 that showed a streak of scar v. atelectasis on the left lateral chest wall. His treating physician, Dr. Gaskins, subsequently *Page 7 
diagnosed him with chronic obstructive pulmonary disease on November 9, 1993. There was no evidence of asbestos-related disease, fibrosis or scarring from dust exposure on this x-ray. Dr. Gaskins advised plaintiff to stop smoking but plaintiff failed to follow this advice.
16. On April 14, 1997, Dr. Gaskins obtained a chest x-ray of plaintiff's lungs and stated there was a new solid area in the left lung since the chest x-ray of 1991. A CT scan taken April 15, 1997 revealed findings consistent with left upper lobe neoplasm, post obstructive pneumonitis and a probable left adrenal metastasis.
17. Plaintiff was examined by Dr. Whetsell at LaFayette Clinic on April 16, 1997. Dr. Whetsell diagnosed plaintiff with an abnormal chest x-ray in a smoker consistent with bronchogenic carcinoma and recommended a bronchoscopy.
18. Plaintiff had a bronchial washing on April 18, 1997. It showed malignant cells consistent with non-small cell carcinoma. Plaintiff also underwent a biopsy on this date that showed poorly differentiated non-small cell carcinoma favoring non-keratinizing squamous cell carcinoma.
19. Plaintiff was examined by Dr. Bakri, an oncologist, at Cape Fear Valley Medical Center on April 29, 1997 for a chemotherapy recommendation. Upon examination of Mr. Morris' chest, Dr. Bakri noted plaintiff' lungs were emphysematous.
20. Plaintiff had a second bronchial washing on June 2, 1997 that showed acute inflammation and reactive changes. Plaintiff had a chest x-ray on August 21, 1997 that showed a continued left hilar mass with ill-defined opacity extending into the left upper lobe.
21. Plaintiff was admitted to Betsy Johnson Regional Hospital on June 9, 1999, where Dr. Rao diagnosed him with probable pneumonia, lung neoplasia, and chronic obstructive pulmonary disease with a continued smoking habit. A chest x-ray showed a left hilar mass *Page 8 
corresponding to the history of lung cancer with left upper lobe atelectasis and/or infiltrate. Tomography of the chest showed a large left pleural effusion as well as patchy parenchymal infiltrate suggestive of post obstructive pneumonia.
22. Plaintiff died on May 11, 2005 due to lung cancer.
23. Both Dr. Warhol, a pathologist, and Dr. Utell, a specialist in pulmonary medicine testified that in order to equate workplace exposures to lung cancer, there must be underlying medical evidence of pneumoconiosis, which is an occupational disease in the lungs related to the inhalation of foreign substances. If plaintiff were exposed to dust, whether it was asbestos, talc or silica, those substances would cause diffuse scarring in the lungs, more commonly known as fibrosis. Dr. Warhol testified that he was not aware of any substances to which employees are exposed in the workplace that would contribute to the formation of lung cancer without first creating pneumoconiosis.
24. Dr. Warhol testified that when a foreign substance enters the lungs, one of two things could happen. Either it will be expelled from the lungs through the body's natural defenses or it will make its way into the parenchyma or pleura of the lungs and lodge there. If the substance lodges in the lung, the body will form scar tissue in that area. This scarring will show up on radiographs. If it is diffuse, it is termed fibrosis. If it is focal, in other words, in one spot of the lungs, it is not linked to dust inhalation. This fibrosis can eventually lead to lung cancer in some cases. In cases of asbestos exposure, pleural plaques are the most sensitive marker of asbestos exposure. In other words, plaques are the first things to develop in the lungs as a result of asbestos exposure.
25. Plaintiff had chest x-rays done on June 13, 1991, April 14, 1997, and August 21, 1997. He also had a CT scan of his lungs on April 15, 1997. Although these films showed *Page 9 
changes consistent with lung cancer, none of these films showed any evidence of pneumoconiosis or fibrosis related to the inhalation of dust.
26. Dr. Warhol reviewed plaintiff's medical records and two slides of his lungs, one of bronchial washings and one of the biopsy. From these slides and medical records, Dr. Warhol found the presence of non-small cell carcinoma of the squamous type. He did not find any evidence of pneumoconiosis or specifically any asbestos-related disease. Dr. Warhol explained that a bronchial washing is a process where a tube is placed down a patient's trachea to irrigate a suspicious area. If a tumor is present, it will shed cells that will appear in the fluid. The fluid is then placed on a slide for examination. Dr. Warhol explained that asbestos bodies would show up in this fluid in a patient with asbestosis. In plaintiff' case, he had no asbestos bodies present on either bronchial washing.
27. Dr. Woodhall Stopford, a medical doctor at Duke University and associate professor at the University of North Carolina at Chapel Hill School of Public Health opined that that plaintiff's employment put him at an increased risk of developing lung cancer for working in the Banbury mixing area and chemical mixing area and being exposed to the dust associated with the rubber making process.
28. Dr. Stopford testified about 16 studies that proved an increased risk of cancer in the tire industry; however, all 16 of these studies either contradict plaintiff's allegations of increased risk, or dealt with tire plants older than the Fayetteville plant, where plaintiff worked.
29. Plaintiff tendered Dr. Savitz, as an expert epidemiologist, to testify that plaintiff's employment at the Fayetteville Kelly plant exposed him to environmental factors that created an increased risk of lung cancer compared to the general public. However, Dr. Savitz had never been to plaintiff's place of employment or observed his exact job duties. Furthermore, Dr. Savitz *Page 10 
testified that he was unfamiliar with plaintiff's history and he was unaware of the details of plaintiff's condition including his exposure and other contributory factors such as smoking.
30. The Full Commission affords great weight to the study of defendant-employer's Tyler, Texas plant performed by Dr. Corn, a certified industrial hygienist and former head of OSHA, and Dr. Carlo, a certified epidemiologist with a Ph.D. in experimental pathology. This study was published in the Journal of Occupational Medicine and peer-reviewed. The study is a cohort mortality study of workers in the Tyler, Texas plant; however, it also encompasses and references 63 prior studies done of other tire plants in the 1900's-1960's. In addition, Dr. Carlo and Dr. Corn reviewed virtually every study published up through 1992 addressing workplace exposures in the rubber industry.
31. Dr. Corn is a Harvard graduate with a Ph.D. in industrial hygiene and sanitary engineering. He has served as the head of OSHA, has served as a member of the Science Advisory Board of the EPA and has worked as a consultant to the National Cancer Institute. He is Professor Emeritus of the Division of Environmental Health Engineering at the Johns Hopkins University in Baltimore, Maryland and currently works as an Assistant Professor at the Graduate School of Public Health at the University of Pittsburgh. His areas of expertise include safety science, industrial hygiene and environmental pollution. He also specializes in exposure assessment.
32. Dr. Corn is an industrial hygienist and it is his job to assess the risk of the environment and whether the working environment is a significant factor in an individual's condition.
33. The Tyler, Texas study began with a review of the previously published studies on the subject of the risk of occupational diseases in tire workers. These studies ranged from the *Page 11 
early 1900's to exposures occurring post-1960's. Dr. Carlo stated that in the early 1960's, there began to be significant technological improvements in tire plants. One of the main purposes of the study was to see if these improvements were reducing workplace exposures. Based upon a review of previous studies spanning over 60 years, as well as the study of the defendant-employer's plant, Dr. Corn and Dr. Carlo found that exposures in tire plants after the early 1960's were not leading to the development of the diseases that were prevalent in the industry prior to that time. Studies performed back in the 1920's, 1930's and 1940's were done because there was a suspicion that workplace exposures were adversely impacting worker health. Dr. Carlo testified that these early studies were instrumental in cleaning up tire plants in later years.
34. Therefore, the age of a plant is extremely relative in looking at risk. The study found that plants built after 1960 were vastly different from those built between 1945 and 1960, and even more different than those built prior to 1945 in terms of exposure and safety. Dr. Corn stated that generally, the newer the plant is, the cleaner it will be. According to Dr. Corn, this is especially true of plants built around the time of 1970 or later, when OSHA came into effect. The Tyler, Texas plant, the plant examined in the study, was built in 1962. However, the Fayetteville plant, where plaintiff worked, was not built until 1969. The results of the study revealed that the Tyler plant was a very modern plant with no evidence of an increased risk of developing occupational diseases. Dr. Corn testified that the Fayetteville plant was in even better condition, and similar with respect to potential exposures; therefore, there was no excess mortality from lung cancer or any other cancers among workers at the Fayetteville plant. Dr. Carlo, who visited both plants, stated that the Fayetteville plant was cleaner and better in terms of technology. *Page 12 
35. Another reason the Full Commission gives greater weight to the Tyler, Texas study is the best evidence in this case is that it was a quantitative assessment versus a qualitative one. Dr. Carlo explained that a qualitative assessment is taking a broad look at something; for example, comparing rubber workers versus auto plant workers. Another example was number of years in a plant, which is quantitative versus just working in a plant, which is qualitative. Quantitative measurements include dose response or how much exposure leads to disease. Therefore, a qualitative assessment is of less value when looking at risk.
36. The Tyler, Texas study was quantitative and looked specifically at exposures and an environment similar to plaintiff's. Dr. Carlo testified "there is virtually no evidence of increased risk of lung cancer from that environment." The study showed no excesses in mortality from cancers that were of any significance. The study examined approximately 2,000 or more workers, excluding short-term workers, which is a common practice in cohort studies. All cancers were examined, and the study found no evidence of dose response in terms of years worked and exposures.
37. Dr. Carlo testified that he and Dr. Corn have continued to track studies being done in this area. "There have been no studies that I am aware of that refute the concept that we put forth here, and that is that the risk in the newer plants are much less than the risks in the older plants. And we've not seen anything in the literature that casts doubt on that conclusion." In addition, no study has been done even similar to the Tyler study in terms of looking at a modern tire plant. Other studies done since the Tyler study have been focused on the historic rubber worker situation.
38. Plaintiff attacks the admissibility of the findings from this study on grounds that there is no evidence of studies similar to the Tyler, Texas study and alleges that it is therefore, *Page 13 
unreliable. However, the North Carolina Court of Appeals has held that, "The general acceptance of a particular method by the scientific community may be one indicator of its reliability; however, a lack of general acceptance is not dispositive." See State v. MacCardwell,133 N.C. App. 496, 516 S.E.2d 388, 395 (1999). Drs. Carlo and Corn's study has been widely published, so it has been subject to peer review, its rate of error is known or can be readily approximated.
39. The Full Commission affords greater weight to the fact that Dr. Corn actually visited defendant-employer's facility in Fayetteville. He examined the areas where plaintiff worked and observed workers performing their job duties. He also reviewed measurements performed by the employer in the Banbury area of the plant, where plaintiff worked, during the time period in which plaintiff worked.
40. As part of his assessment of exposures at the Fayetteville plant, Dr. Corn took all of the samples from the facility and compared them to then existing permissible exposure limits ("PEL"), which are limits on over 800 substances that OSHA has set for workplace exposures. Dr. Corn discussed excursions which were instances when there would be a failure of some procedure which would allow a higher than average level of exposure over the PEL. For the Fayetteville plant, from 1970 to 1986, Dr. Corn found no excursions for respirable dust. In other words, all levels were below then existing PELs. During this time period, there were only two excursions for carbon black and one for asbestos. However, the excursion for asbestos was within the then existing PEL. For the time period of 1987 to 1997, there were no samples of total or respirable dust over the PEL. Samples for formaldehyde, nitrobenzene, benzine, toluene, silica dust, carbon black and acetone were all within the permissible PELs as well. Dr. Corn *Page 14 
stated that the fact that 99% or more of the measurements were below the PEL was a good indicator that the plant was under control with respect to exposures.
41. With respect to the carbon black exceeding the PEL on two occasions, Dr. Corn stated that carbon black is not a carcinogen to humans. In fact, Dr. Corn stated he was not aware of any disease associated with chronic carbon black exposure. Furthermore, in this case, there were only two occasions where the carbon black did exceed the PEL, so this was not a case of chronic exposures where carbon black was above PELs according to Dr. Corn.
42. Plaintiff relied upon a 1996 IARC study in an attempt to prove carbon black is a carcinogen. However, the Full Commission affords less weight to this study as it merely classified carbon black as apossible carcinogen based upon animal studies. Furthermore, Dr. Corn explained the results of the study that actually showed that carbon black has not been proven to be a carcinogen to humans.
43. The Full Commission finds that plaintiff failed to prove both exposure to cancer causing agents and increased risk of developing lung cancer as a result of his employment.
44. Furthermore, the Full Commission finds that the totality of the evidence presented in this case supports finding that smoking caused plaintiff's lung cancer. Plaintiff was diagnosed with lung cancer on April 18, 1997. A bronchial washing on this date showed malignant cells consistent with non-small cell carcinoma. Plaintiff also underwent a biopsy on this date that showed poorly differentiated non-small cell carcinoma favoring non-keratinizing squamous cell carcinoma.
45. Non-small cell or large cell squamous cell carcinoma is a type of cancer commonly associated with cigarette smoking. Furthermore, all three medical doctors in this case, including Dr. Stopford, agreed that the type of cancer plaintiff had is related to smoking. *Page 15 
Dr. Warhol stated that squamous non-small cell carcinoma is an ordinary or common diagnosis in someone with plaintiff's smoking history. None of plaintiff's experts disagreed that smoking was the primary cause of the lung cancer in this case.
46. Dr. Warhol, Dr. Utell, Dr. Carlo, and Dr. Corn all testified that plaintiff's smoking was in fact the sole cause of his lung cancer based upon the fact that he started at the very young age of 5, smoked regularly for 55 years or more, and inhaled between 2 and 2 1/2 packs of cigarettes per day.
47. Plaintiff acknowledges that his smoking contributed to his development of lung cancer, but that his occupational exposures worked together with the smoking to increase his risk of developing the lung cancer. Dr. Carlo, a certified epidemiologist, testified that there was no synergistic effect between smoking and workplace exposures in this case. Dr. Carlo has done risk assessment for the EPA on environmental tobacco smoke. Dr. Carlo testified that smoking is the most significant risk. The Full Commission finds Dr. Carlo to be credible and affords greater weight to his testimony.
48. The Full Commission finds that plaintiff has failed to show that the type of lung cancer from which he suffered is an extraordinary disease to which the public is not equally exposed. Plaintiff suffered from non-small or large cell squamous cell carcinoma. The Surgeon General's report in 1982 listed this type of cancer as related to smoking. Dr. Warhol testified that this type of cancer is an ordinary and common diagnosis in a smoker. In addition, smoking is the leading cause of lung cancer and 90% or more of lung cancers in men are attributable to cigarette smoking.
49. The greater weight of the evidence shows that there was no fibrosis or diffuse scarring of plaintiff's lungs. None of the chest x-rays or the CT scan showed pleural plaques or *Page 16 
interstitial fibrosis. Consequently, the Full Commission finds as a matter of fact that plaintiff has failed to prove he contracted occupational lung cancer due to dust exposure in his workplace.
50. The Full Commission finds that plaintiff has failed to prove his lung cancer was caused or significantly contributed to by his employment and that his employment placed him at a greater risk of developing lung cancer.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Lung cancer is not an enumerated disease under N.C. Gen. Stat. § 97-53 of the Workers' Compensation Act. Therefore, the plaintiff in this case must prove two factors to receive compensation for his lung cancer. First, he must show that his occupation exposed him to a greater risk of contracting lung cancer than ordinary members of the public. Second, he must show that his exposure to substances peculiar to his occupation significantly contributed to or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E. 2d 359 (1983); Goodman v. Cone Mills Corp.,75 N.C. App. 493, 331, S.E. 2d 261 (1985). Plaintiff has failed to prove his occupation exposed him to a greater risk of contracting lung cancer than ordinary members of the public. In addition, plaintiff has failed to prove that he was exposed to substances in his workplace that would significantly contributed to or were significant causal factors in his development of lung cancer. The greater weight of the evidence shows that cigarette smoking was the cause of plaintiff's lung cancer.
3. When workplace exposures are not a significant causal factor in, or do not significantly contribute to, the development of the disease, then the disease is not an occupational *Page 17 
disease within the purview of N.C. Gen. Stat. § 97-53(13), and no compensation is due. Neal v. Leslie Fay, Inc., 78 N.C. App. 117,336 S.E. 2d 628 (1985).
 * * * * * * * * * * *
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits must be and is hereby denied.
2. Each side shall pay its own costs.
This the 24th day of March 2008.
S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER
 *Page 1