BRUCE HOWERTON, JR., DDS, Plaintiff v. ARAI HELMET, LTD., a Japanese
Corporation; ARAI HELMET, LTD., a New Jersey Corporation; and TOM
BRISSEY, Defendants

No. COA02-612

(Filed 17 June 2003)

**1. Evidence; Witnesses— expert opinion—Daubert analysis—scientific reliability—causation**

The trial court did not abuse its discretion in a negligence and products liability case concerning the alleged defective design of a motorcycle helmet by excluding the causation testimony of four of plaintiff's experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because: (1) North Carolina has adopted the Daubert analysis concerning scientific reliability; (2) where the methodology and techniques of the proffered experts are either challenged or novel, the case law does not support the proposition that trial courts are prohibited from testing reliability; and (3) the record is replete with competent evidence supporting the challenged findings of the trial court.

**2. Unfair Trade Practices— misrepresentation of motorcycle helmet—proximate cause—reliance**

The trial court did not err by granting summary judgment in favor of defendant with respect to the unfair and deceptive trade practices claim under N.C.G.S. § 75-1.1 arising out of the alleged erroneous representations concerning the design of a motorcycle helmet, because: (1) plaintiff failed to forecast evidence creating a genuine issue of material fact as to whether defendant's alleged representations, that its helmet was designed to reduce the possibility of cervical injuries and that it was Snell certified, were a proximate cause of his injuries; and (2) even assuming that defendant engaged in an unfair and deceptive trade practice in or affecting commerce, plaintiff's deposition testimony demonstrated that he did not detrimentally rely on the assumed misrepresentation.

Appeal by plaintiff from judgment entered 27 February 2002 by Judge Wade Barber in Superior Court, Orange County. Heard in the Court of Appeals 12 March 2003.

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

*Womble, Carlyle, Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr., Richard T. Rice and Christopher W. Jones, for plaintiff-appellant.*

*Ellis & Winters, L.L.P., by Richard W. Ellis, Matthew W. Sawchak and Andrew S. Chamberlin, for defendants-appellees.*

*Twiggs, Beskind, Strickland & Rabenau, P.A., by Howard F. Twiggs, Donald H. Beskind, and Jerome P. Trehy, Jr., on behalf of the North Carolina Academy of Trial Lawyers, amicus curiae.*

*Smith, Moore, L.L.P., by James G. Exum, Jr., Jon A. Berkelhammer, and Allison O. Van Laningham, on behalf of the North Carolina Association of Defense Attorneys and the North Carolina Citizens for Business and Industry, amicus curiae.*

WYNN, Judge.

## Summary

This appeal arises from an action instituted by Dr. Bruce Howerton, D.D.S., alleging that his quadriplegic condition, resulting from a motorcycle accident, was caused by a negligently designed helmet. He contends that Arai Helmet, Ltd. ("Arai") negligently designed his helmet without an integrated chin bar which would have distributed the compressive force of his motorcycle collision throughout his chest, thereby preventing the hyperflexion of his neck and resulting quadriplegia. At trial, upon considering evidence proffered by Dr. Howerton's four expert witnesses, the trial court, applying the reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), concluded that the experts did not offer reliable opinions on causation. Consequently, the trial court granted Arai's summary judgment motion because Dr. Howerton "failed to offer evidence sufficient to raise a material issue of disputed fact as to the element of causation."

On appeal, Dr. Howerton contends the trial court erred by (1) relying upon *Daubert* in determining the admissibility of expert testimony, (2) applying the *Daubert* framework, assuming that it was properly used, and (3) concluding that his unfair and deceptive trade practices' claim failed as a matter of law. After carefully reviewing the record, relevant case law, and arguments of counsel, we hold that (1) North Carolina has recognized and endorsed the use of the *Daubert* framework to the admission of expert testimony, (2) in

applying the *Daubert* framework the trial court did not abuse its discretion by excluding the proffered testimony of plaintiff's expert witnesses, and (3) that trial court properly granted Arai's summary judgment motion with respect to plaintiff's unfair and deceptive trade practices' claim, as plaintiff failed to forecast any evidence of proximate cause. Accordingly, we affirm the determination of the Superior Court, Orange County.

### I. Facts and Proceedings in Trial Court

On 7 January 2002, Arai filed an omnibus summary judgment motion on all claims and a motion to exclude the testimony of plaintiff's experts on the issue of causation. In a 29 January 2002 hearing, the trial court reviewed memorandum of law, depositions, and various other discovery responses relating to the reliability of the proffered experts. After making extensive findings of fact, the trial court granted Arai's motion because the expert testimony was not reliable. The pertinent explanatory information, deposition testimony of these experts, as well as the trial court's findings of fact and conclusions of law are set forth below.

In the trial court, the fundamental issue was whether Dr. Howerton could produce reliable expert testimony that Arai's helmet design was the proximate cause of his quadriplegia. The record indicates that motorcycle helmets are either full-face or open-face designs. Whereas full-face designs have an integrated chin bar built into the helmet's molded shell, open-face designs do not have an integrated chin bar. According to the Snell Memorial Foundation, a nonprofit organization specializing in safety certification for helmets, "full-face helmets provide a measure of facial protection in addition to the impact protection generally sought."

During his collision, Dr. Howerton wore an Arai open-face helmet. Like a full-face helmet, the Arai helmet had a chin guard.[1] However, unlike full-face helmets, the chin guard was not integral. Instead, the chin guard was attached to the body of the helmet with nylon screws. According to Arai, the nylon screws permitted the chin guard to breakaway during accidents and thereby prevented the chin

---

1. The parties dispute the terminology which should be applied to the "guard" on Arai's open-face helmet design. Arai insists that the guard is not a chin guard, but rather a "mouth guard" or "rock guard [designed] to protect the lower part of a rider's face from rocks and other debris kicked up by other riders." Dr. Howerton claims, on the other hand, that the "guard" is simply a defectively designed chin guard. The terminology, however, is irrelevant, and, for purposes of clarity, we have chosen to refer to the guard as a "chin guard."

guard from turning into a lever on the neck. According to Dr. Howerton, this "flexible design," and the corresponding advertising campaign promoting its benefits, was negligent and deceptive. Dr. Howerton claims that if the Arai helmet had been a full-face helmet, the helmet would have prevented his quadriplegia. To support this claim, Dr. Howerton produced, and subjected to deposition, four expert witnesses: Professor Hugh Hurt, Dr. William Hutton, Dr. Charles Rawlings, and James Randolph Hooper.

First, Dr. Howerton offered the expert testimony of Professor Hugh Hurt, President of the Head Protection Research Laboratory of Southern California and Professor Emeritus of Safety Science at the University of Southern California. Arai stipulated to Professor Hurt's expertise in the following subjects: (1) Motorcycle accident investigation and reconstruction, (2) Motorcycle helmet design and construction and related industry standards, and (3) Motorcycle helmet testing and motorcycle helmet performance in accidents and related government industry standards.

In his deposition, Professor Hurt testified that his review and reconstruction of the accident showed that:

> [As] a result of the collision, [Dr. Howerton] was thrown over the handlebars, to land on the back of his helmeted head. . . . And in that process, the failure of the flexible chin bar on the Arai helmet allowed a degree of hypermotion of the neck, which produced the injury that he suffered. . . . I think, essentially any other dirt bike helmet with a chin bar, with an integral chin bar, with a rigid chin bar, that Dr. Howerton would not have suffered that critical neck injury due to the unlimited hyperflexion.

Professor Hurt based his causation opinion—that an integrated chin bar would have prevented Dr. Howerton's quadriplegia—on his investigation and reconstruction of three motorcycle accidents. In these three accidents, motorcycle riders wearing full-face helmets did not suffer neck or cervical injuries despite a head landing. In investigating the respective accidents, Professor Hurt noticed a red "u" or "v" shaped mark on the chest of each motorcycle rider. Professor Hurt deduced that these marks were caused when the rigid integrated chin bar on the full-face helmet struck the chest of the rider during the accident. Essentially, when the integrated chin bar struck the chest, the rotation of the rider's neck was limited. According to Professor Hurt, the Arai helmet's breakaway, or flexible, design was defective because it permitted unlimited

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

hyperflexion in the neck and, thereby, created an increased risk of neck injury.

Furthermore, Professor Hurt testified that, without any scientific or engineering evidence, Arai marketed its "flexible helmet design" as a safer alternative to the conventional and rigid designs.[2] According to Professor Hurt, the Arai helmet design created the illusion of being a full-face helmet. Moreover, the consumer was unable to discern the difference, because the only warning regarding the potential hazards of the "flexible chin guard" were visible only to a rider who disassembled the helmet.

After reviewing Professor Hurt's deposition testimony, arguments from counsel, case law, and memorandums of law, the trial court made the following pertinent findings of fact:

19. Professor Hurt could not quantify the extent to which a full-face helmet would prevent forward flexion of the head and neck.

20. Professor Hurt did not test or perform independent research on his hypothesis that full-face helmets equipped with rigid chin bars prevent neck injuries. He did not subject his hypothesis to peer review by publishing it to his peers.

21. Professor Hurt did not report his hypothesis to the United States government, for whom he conducted extensive studies that included work on motorcycle helmet safety.

22. Professor Hurt was not able to identify any published work by any author that expressly supported his hypothesis and, thus, did not present any evidence other than his unsupported assertions that his hypothesis is generally accepted in the field.

23. Indeed, Professor Hurt's published work did not support—and in fact tends to contradict—his hypothesis that full-face helmets prevent neck injuries. In a University of Southern California report published in 1981, Professor Hurt published data indicating that serious neck injuries occurred

---

2. Aria, however, notes that its "design concerns were consistent with the developing literature on motorcycle helmets." To support this proposition, Arai relies on a 1981 study conducted by Professor Hurt which showed that riders with open-face helmets suffered serious cervical injuries less often than riders with full-face helmets. Professor Hurt's report noted: "It is clear from these data that the [open-face] helmets have a significant beneficial effect reducing neck injury."

more frequently in riders wearing full-face helmets than in riders wearing . . . open-face helmets that were not equipped with chin bars.

. . . .

25. Professor Hurt's opinion that a full-face helmet would have prevented plaintiffs' injury is speculative and based on inadequate data.

26. Professor Hurt's opinion that a full-face helmet would have prevented plaintiff's injury in not reliable. . . . [To] the extent that his methods represent a technique, it is clear that this technique is subject to an unacceptable high risk of error.

Accordingly, the trial court granted Arai's motion to exclude Professor Hurt's causation testimony on the basis of unreliability.

Next, Dr. Howerton offered as an expert in biomechanics Dr. William Hutton, Professor and Director of Orthopedic Research at Emory University School of Medicine. Dr. Hutton inspected plaintiff's helmet and opined that:

When Arai's removable, flexible chin guard touched Dr. Howerton's chest, it should have prevented further flexion and should have transferred a significant portion of the applied force through his chin guard and into his chest. Instead, the bottom screws of the chin guard broke allowing over forty degrees of additional rotation of Dr. Howerton's head and neck. This additional rotation and lack of support from the broken chin guard, permitted additional flexion and compression forces to be exerted on Dr. Howerton's neck. These additional forces resulted in the flexion-compression fractures and movement of the C5 and C6 vertebrae that caused the compromise of Dr. Howerton's spinal cord and the resulting quadriplegia.

Dr. Hutton opined on the issue of causation that the Arai helmet's breakaway feature caused plaintiff's neck to enter into a flexion beyond the physiological limit—"hyperflexion." The hyperflexion magnified the compressive force of the impact, and, in the case of Dr. Howerton, this caused a retropulsion of bone into the spinal canal. Essentially, like Professor Hurt, Dr. Hutton testified that an integrated chin bar would have prevented Dr. Howerton's quadriplegia.

After reviewing Professor Hurt's deposition testimony, arguments from counsel, case law, and memorandums of law, the trial court made the following pertinent findings of fact:

48. Dr. Hutton conceded . . . that he has never researched, tested or published his hypothesis that the degree of retropulsion of bone fragments is a function of the degree of flexion or hyperflexion involved. He could not cite [] medical or scientific literature in support of this position. Dr. Hutton also conceded that retropulsion of bone fragments can occur in the absence of hyperflexion. Further, he acknowledged that plaintiff could have sustained some degree of retropulsion even if he had been wearing a full-face helmet. Finally, he conceded that he does not know how much retropulsion the spinal cord can withstand before paralysis occurs.

49. Dr. Hutton admitted that he had never dealt with a cervical injury similar to that experienced by plaintiff.

50. Dr. Hutton admitted that he could not identify any literature that supported the conclusion that plaintiff would not have been paralyzed but for the hyperflexion.

51. Dr. Hutton's opinion that plaintiff's injuries were caused by hyperflexion is speculative and based on inadequate data.

52. Dr. Hutton's opinion that plaintiff's injuries were caused by hyperflexion is not reliable. . . . To the extent that his methods represent a technique, it is clear that they incorporate an unacceptably high rate of error.

Accordingly, the trial court granted Arai's motion to exclude Dr. Hutton's causation testimony on the basis of unreliability.

Next, Dr. Howerton offered Dr. Charles Rawlings as an expert in neurosurgery. Dr. Rawlings conducted his residency and received a Doctorate in Medicine from the Duke University Medical Center. Between 1989 and 1999, Dr. Rawlings performed two to three surgeries per month for cervical fractures. At the time of his deposition, Dr. Rawlings was enrolled in Wake University School of Law.

In his deposition, Dr. Rawlings opined that Dr. Howerton did not suffer any cervical injuries until his head rotated forward beyond the normal range of motion. Essentially, like Professor Hurt and Dr. Hutton, Dr. Rawlings' testimony supported the theory that the Arai helmet's flexible design permitted plaintiff's head and neck to rotate

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

beyond physiological limits. With respect to Dr. Rawlings' testimony, the trial court made the following pertinent findings of fact:

> 41. . . . . [Dr. Rawlings] conceded that unless the amount of force is known, it is impossible to distinguish one degree and forty-five degrees of flexion based on radiology films. Dr. Rawlings conceded that he did not know the amount of force involved in the accident. Dr. Rawlings acknowledged that he had no medical basis to opine about whether plaintiff's head was rotated forward in flexion five degrees or forty-five degrees at impact.

> 42. Even though he did not know the force involved in the accident and could not accurately identify the position of plaintiff's head at impact, Dr. Rawlings opined that plaintiff would not have been paralyzed but for his head rotating beyond that normal anatomical range of motion. He admitted, however, that there are no objective criteria that can be used to confirm his hypothesis. . . .

Based on these findings, the trial court found that "Dr. Rawlings' opinion that plaintiff injury was caused by hyperflexion is not reliable."

Finally, Dr. Howerton offered James Randolph Hooper as an expert in helmet design. Mr. Hooper was the chief design engineer for a full-face motorcycle helmet developed at the same time Arai was developing its "flexible design"—1978-1982. Mr. Hooper testified that in 1978 it was well known in the helmet industry that rigid chin bars significantly increased the overall stiffness of the helmet and increased protection from impacts in all axises. Mr. Hooper opined that the Arai's flexible chin guard offered no protection during impact. Furthermore, Mr. Hooper related the details of many accidents in which the rider was (1) wearing a full-face helmet, (2) flipped over the handlebars landing on top of the head, and (3) did not suffer severe neck injury.

During Aria's cross-examination of Mr. Hooper the following colloquy occurred:

> Q: Do you contend that you have any sort of expertise so that you can offer an opinion with respect to whether a helmet will prevent a particular type of neck injury?

> A: No.

Q: Is that something you have expertise in?

A: No.

After reviewing Mr. Hooper's deposition testimony, arguments from counsel, case law, and memorandums of law, the trial court made the following pertinent findings of fact:

28. Mr. Hooper is not a medical doctor, an accident reconstructionist, an expert in biomechanics, or an engineer. He does not have a college degree.

29. When deposed, Mr. Hooper expressly conceded that he did not have the expertise to opine that a full-face helmet equipped [with] an integrated chin bar would have prevented plaintiff's injury.

. . . .

32. Mr. Hooper is not qualified to offer the opinion that a full-face helmet would have prevented plaintiff's injury in this case. His opinion that a full-face helmet would have prevented plaintiff's injury was speculative and based on inadequate data. Further, Mr. Hooper did not have a reliable basis to offer any meaningful comparison between his own history of accidents and plaintiff's accident.

After making the appropriate findings of fact, the trial court articulated the law on the admissibility of expert testimony and, thereafter, applied the law to the facts. In pertinent part, the trial court concluded:

1. North Carolina has adopted *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993). *See State v. Goode*, 341 N.C. 513, 461 S.E.2d 631, 639 (1995); *see also State v. Bates*, 140 N.C. App. 743, 748, 538 S.E.2d 597, 600 (2000).

2. Even before the issuance of the *Daubert* decision, North Carolina courts adopted "reliability" as the touchstone of admissibility for expert opinion testimony as demonstrated in *State v. Pennington*, 327 N.C. 89, 98, 393 S.E.2d 847, 852 (1990). The indicia of reliability identified by the North Carolina Supreme Court in *Pennington* are consistent with the indicia of reliability found in *Daubert*. The opinions expressed by plaintiff's experts fail under either analysis.

3. The inquiry of the Court is not limited to the qualifications of the experts. Implicit in Rule 702 of the North Carolina Rules of Evidence is the precondition that the matters or data upon which an expert bases his opinion be recognized in the scientific community as sufficiently reliable and relevant. *Davis v. City of Mebane*, 132 N.C. App. 500, 503, 512 S.E.2d 450, 452 (1999), *rev. dismissed as improvidently granted*, 351 N.C. 329, 524 S.E.2d 569 (2000). The test of reliability involves a preliminary assessment of whether the reasoning or methods at issue are sufficiently valid. *Goode*, 341 N.C. at 527, 461 S.E.2d at 639 (citing *Daubert*).

Based on these principles of law, the trial court, in its discretion, concluded that the opinion testimony of Professor Hurt, Dr. Hutton, and Dr. Rawlings, on the issue of causation, was unreliable and, therefore, inadmissible. Moreover, the trial court concluded, in its discretion, that Mr. Hooper was not qualified to offer his expert testimony on the issue of causation. Accordingly, the trial court granted Arai's 7 January 2002 motion for summary judgment because "[in] the absence of reliable expert opinion testimony on the issue of causation . . . [the] plaintiff [] failed to offer evidence sufficient to raise a material issue of disputed fact as to the element of causation." Furthermore, the trial court granted Arai's partial summary judgment motion regarding plaintiff's claim for unfair and deceptive trade practices. The trial court concluded that this claim failed as a matter of law. From this summary judgment order, plaintiff appeals.

## II. Has North Carolina Adopted *Daubert*?

[1] By his first argument, Dr. Howerton contends the trial court erred by excluding the causation testimony of his four expert witnesses under *Daubert*. Dr. Howerton asserts North Carolina has not adopted *Daubert*, and, consequently, the trial court committed reversible error by applying the wrong legal standard in determining the admissibility of his causation experts. After thoroughly reviewing the relevant case law, we disagree.

North Carolina courts, as well as courts of the United States, have long struggled with the admissibility, and evidentiary power, of "expert" testimony. This struggle has been particularly fierce in litigation advancing a "novel" theory of causation and/or liability. In *Frye v. United States*, decided in 1923, the Court of Appeals for the District of Columbia created a test for trial courts to apply when judging the admissibility of novel scientific principles, methods, and tech-

niques. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In *Frye*, the court held that:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs.

Under the *Frye* test, as this standard became known, the proponent of scientific evidence is required to establish the general acceptance, within the relevant scientific community, of the proposed expert's scientific principles, methods, and techniques. "In the 70 years [after] its formulation . . . , the 'general acceptance' test [became] the dominant standard for determining the admissibility of novel scientific evidence at trial." *Daubert*, 509 U.S. at 585. However, over time, legal scholars came to criticize the *Frye* test as unduly restrictive. Specifically, the *Frye* test inappropriately restricted parties from using novel, yet reliable, scientific evidence.

In the midst of this debate, the United States Congress enacted the Federal Rules of Evidence in 1975. Rule 702 provided that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702 (1975) (repealed 1996). After the promulgation of these rules, legal scholars debated whether or not the enactment of Rule 702 supplanted *the Frye* test, particularly in light of the "liberal thrust" of the Federal Rules of Evidence.

In *Daubert*, the United States Supreme Court resolved this question and held that the *Frye* Test did not survive the enactment of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 589. Although *Frye* no longer applied, the Court noted that the new rules did not relieve trial courts from screening expert testimony.[3] "To the contrary, under

---

3. The *Daubert* Court noted that screening of expert testimony by the trial court is permitted because, unlike lay witnesses, expert witnesses are permitted wide latitude to offer opinion testimony that is not based on first hand knowledge or observa-

HOWERTON v. ARAI HELMET, LTD.

[158 N.C. App. 316 (2003)]

the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* The Court arrived at this holding through a standard statutory interpretation of Rule 702. Specifically, the Court concluded that: (1) "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability," and (2) the requirement that "the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue' " establishes (a) a standard of relevance and (b) a requirement that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 591 (citations omitted). As to this latter requirement, commonly referred to as the "fit requirement," the Court explained:

> The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Id.*

Accordingly, after *Daubert*, trial courts were required to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In making this preliminary assessment, the *Daubert* Court announced, in dicta,[4] four principles that trial courts should ordinarily consider in determining whether expert testimony is admissible pursuant to Rule 702: (1) whether the theory or technique can be (or has been) tested, (2) whether the theory or

---

tion. "Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents 'a most pervasive manifestation' of the common law insistence upon the most reliable sources of information,'—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. Accordingly, for the *Daubert* Court, it should not be "surprising" that the trial court should function as a gatekeeper with respect to ensuring the scientific validity—i.e., reliability—of the opinion testimony offered.

4. *See e.g.*, GE v. Joiner, 522 U.S. 136, 151 Fn. 2 (1997) (noting "the Daubert test was announced in dicta").

HOWERTON v. ARAI HELMET, LTD.

[158 N.C. App. 316 (2003)]

technique has been subjected to peer review by publication, (3) whether the theory or technique has a known rate of error, and (4) whether the technique has achieved a general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-95. Importantly, the *Daubert* court noted that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 594-95. Consequently, the *Daubert* Court expressly equated scientific validity with reliability, i.e., the competence of the witness.

In the years following *Daubert*, the United States Supreme Court has refined and explicated the *Daubert* standard on two occasions. In *General Electric v. Joiner*, 522 U.S. 136 (1997), the Supreme Court held that "abuse of discretion is the proper standard by which to review a [trial] court's decision to admit or exclude scientific evidence." *Id.* at 146. Two years later, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Court held that expert testimony based on technical or specialized knowledge is subject to the same gatekeeping function applicable to scientific knowledge. *Id.* at 152-58.

Despite the fact that *Daubert* is a decision of the United States Supreme Court, neither *Daubert*, nor its progeny, are binding upon the states. *See, e.g., State v. Bogle*, 324 N.C. 190, 202, 376 S.E.2d 745, 752 (1989). However, our Supreme Court and General Assembly have expressed the opinion that "uniformity of evidence rulings in the courts of this State and federal courts [was] one motivating factor [for North Carolina] in adopting [our evidence] rules and [it] should be a goal of our courts in construing those rules that are identical." *Id.* (quoting N.C. Gen. Stat. § 8C-1, Rule 102 commentary (2002)). At the time of *Daubert*, the North Carolina rule regarding the admissibility of expert testimony was identical to the federal rule interpreted by the *Daubert* Court.[5] *See* N.C. Gen. Stat. § 8C-1, Rule 702 commentary (2002).

---

5. In North Carolina, the admissibility of expert testimony is governed by Rule 702 of the North Carolina Rules of Evidence which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C. Gen. Stat. § 8C-1, Rule 702 (2002). In 2000, however, the federal rule was amended to codify *Daubert* and its progeny.

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

Despite the mandate of our General Assembly and State Supreme Court to construe identical state and federal rules of evidence in a manner that encourages uniformity, Dr. Howerton argues Rule 702 of the North Carolina Rules of Evidence, contrary to the United States Supreme Court's interpretation of the identical federal rule in *Daubert*, does not permit a trial court to test the reliability of expert testimony before allowing the case to proceed to the jury on the merits. For Dr. Howerton, a trial court's reliability inquiry smacks of a determination of witness credibility and evidentiary weight that should be resolved by the jury, rather than upon summary judgment. *See Federal Paperboard v. Kamyr, Inc.*, 101 N.C. App. 329, 399 S.E.2d 411 (1991).

The reliability determination provided in *Daubert*, however, is generally a judgment focused on the principles and methodology of the proposed testimony, rather than the substance or conclusions of the testimony.[6] Nevertheless, Dr. Howerton relies on *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995), for the proposition that trial courts should not render reliability determinations and, the corresponding assertion, that trial courts are simply required to (1) identify whether the technique or subject matter is an appropriate area for expert testimony, (2) decide whether the witness is qualified as an expert, and (3) determine whether the proposed testimony is relevant.

Dr. Howerton's reliance on *Goode* is misplaced. In *Goode*, our Supreme Court, relying on *Daubert*, expressly held that the first inquiry a trial court must make in determining the admissibility of expert testimony is whether "the method of proof is sufficiently reliable." *Goode*, 341 N.C. at 513, 461 S.E.2d at 631. This makes sense, because "unless an expert's testimony . . . is sufficiently reliable, it is not considered competent evidence and therefore should not be presented to the jury." *Leatherwood v. Ehlinger*, 151 N.C. App. 15, 23, 564 S.E.2d 883, 889 (2002). To arrive at this conclusion, the *Goode* Court analyzed precedent created over the last half century by the appellate courts of this State. *See, e.g., State v. Pennington*, 327 N.C.

---

6. Admittedly, as the United States Supreme Court held in *Joiner*:

conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*GE v. Joinder*, 522 U.S. at 146.

89, 98, 393 S.E.2d 847, 852 (1990) (holding that "[a] new scientific method of proof is admissible at trial if the method is sufficiently reliable"); *State v. Bullard*, 312 N.C. 129, 148, 322 S.E.2d 370, 381 (1984) (noting that under North Carolina law "scientifically accepted reliability justifies admission of the testimony of qualified witnesses, and such reliability may be found either by judicial notice or from the testimony of scientists who are expert in the subject matter, or by a combination of the two); *State v. Peoples*, 311 N.C. 515, 526, 319 S.E.2d 177, 184 (1984) (holding that hypnosis is inadmissible because "overwhelming scientific evidence suggests that hypnotically refreshed testimony is not inherently reliable and that cross-examination is not an adequate safeguard against the dangers inherent in hypnosis"); *State v. Foye*, 254 N.C. 704, 708, 120 S.E.2d 169, 171 (1961) (holding that polygraph evidence is inadmissible and noting "that the lie detector has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception.").

Accordingly, long before the United States Supreme Court announced its holding in *Daubert*, North Carolina courts embraced the principle that, in determining the admissibility of expert testimony, the "emphasis [is] on the reliability of the scientific method." *Bullard*, 312 N.C. at 149, 322 S.E.2d at 381-82; *see also* Kenneth S. Broun, *Daubert is Alive and Well in North Carolina—In Fact, We Beat the Feds to the Punch*, N.C. St. B.J. (Fall 2002), at 10. Whereas prior to *Daubert* most jurisdictions applied the *Frye* test to novel scientific techniques and methods, North Carolina courts readily disavowed *Frye*'s mechanistic and conservative approach. *See, e.g., Pennington*, 327 N.C. at 98, 393 S.E.2d at 852 (noting that North Carolina courts "do not adhere exclusively to the [*Frye*] formula . . . that the method of proof 'must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' " Rather, the *Pennington* Court, in analyzing North Carolina precedent, believed that "the inquiry underlying the *Frye* formula is one of the reliability of the scientific method rather than its popularity within a scientific community.").

Because North Carolina arrived at the "reliability" principle prior to *Daubert*, the Supreme Court of North Carolina, as well as this Court, struggled to articulate a flexible set of inquires to guide trial courts in their gatekeeping function. For instance, in *Bullard*, Justice Frye explained that expert foot print testimony was admissible because (1) the expert used established techniques, (2) the expert had a strong professional background and qualifications, (3) the

HOWERTON v. ARAI HELMET, LTD.

[158 N.C. App. 316 (2003)]

expert used visual aids so that the jury was not required to accept the scientific hypotheses on faith, and (4) because of independent research conducted by the expert. *Bullard*, 312 N.C. at 150-51, 322 S.E.2d at 382. In *Pennington*, which was also decided before *Daubert*, our Supreme Court followed the *Bullard* precedent, and inquiries, in holding that the "reliability of the DNA profiling process" was sufficient to merit admissibility. *Pennington*, 327 N.C. at 100, 393 S.E.2d at 854.

After the United States Supreme Court announced *Daubert*, however, our appellate courts essentially stopped developing and refining the *Bullard* inquiries. Instead, North Carolina courts simply began to cite *Daubert* as precedent. *See, e.g., Goode*, 341 N.C. at 527, 461 S.E.2d at 639. From the time Justice Orr relied on *Daubert* in *Goode*, this Court has relied upon *Daubert* on fourteen occasions. *See, e.g., Leatherwood v. Ehlinger*, 151 N.C. App. 15, 23-24, 564 S.E.2d 883, 889 (2002) ("Implicit in the rules governing the admissibility of an expert's opinion is a precondition that the matters or data upon which the expert bases his opinion be recognized as sufficiently reliable and relevant by the scientific community."); *State v. Holland*, 150 N.C. App. 457, 463, 566 S.E.2d 90, 93 (2002) ("[W]here the principles underlying expert testimony on handwriting analysis had been repeatedly recognized as reliable and admissible, the trial court was not required to launch into a full analysis of the reliability of its underlying principles."); *State v. Stokes*, 150 N.C. App. 211, 225, 565 S.E.2d 196, 206 (2002) ("The trial court has the duty to act as gatekeeper and to insure that expert opinion is properly founded on scientifically reliable methodology."); *Walter v. Walter*, 149 N.C. App. 723, 733, 561 S.E.2d 571, 578 (2002) (quoting language in *Goode, supra*); *Taylor v. Abernethy*, 149 N.C. App. 263, 272-73, 560 S.E.2d 233, 239 (2002) ("In its role as gatekeeper, the pertinent question for the trial court is not whether the matters to which the expert will testify are scientifically proven, but simply whether the testimony is sufficiently reliable."); *State v. Berry*, 143 N.C. App. 187, 203, 546 S.E.2d 145, 156 (2001) (quoting language in *Goode, supra*); *State v. Davis*, 142 N.C. App. 81, 90, 542 S.E.2d 236, 241 (2001) (noting "*Daubert* . . . discuss[es] the need for the 'reliability' factors to be flexible"); *State v. Bates*, 140 N.C. App. 743, 748, 538 S.E.2d 597, 600 (2000) (noting that *Daubert* was adopted by *Goode*); *State v. Underwood*, 134 N.C. App. 533, 542, 518 S.E.2d 231, 239 (1999) (noting that North Carlina has "adopted factors similar to those of *Daubert*"); *State v. Cardwell*, 133 N.C. App. 496, 505, 516 S.E.2d 388, 395 (1999) (relying on *Daubert* and its progeny); *State v. Dennis*, 129 N.C. App. 686, 693, 500 S.E.2d

765, 769 (1998) (quoting language in *Goode, supra*); *State v. Helms*, 127 N.C. App. 375, 380, 490 S.E.2d 565, 568 (1997), *rev'd on other grounds by State v. Helms*, 348 N.C. 578, 504 S.E.2d 293 (1998) ("The court's 'gatekeeping' function [to ensure reliability] is made necessary by the heightened credence juries tend to give evidence perceived as scientific."); *Setzer v. Boise Cascade Corp.*, 123 N.C. App. 441, 447, 473 S.E.2d 431, 435 (1996) (Walker, J., dissenting in part and concurring in part) (in dissent, applying the publication and peer review inquiries in *Daubert*); *State v. Spencer*, 119 N.C. App. 662, 664, 459 S.E.2d 812, 814 (1995) ("Implicit in these rules is the precondition that the matters or data upon which the expert bases his opinion be recognized in the scientific community as sufficiently reliable and relevant.").

From a thorough review of our case law, it is eminently clear that North Carolina has adopted the *Daubert* analysis. This is not novel. *Daubert* has been the prevailing law in this state since *Goode*. Three years ago, in *Bates*, this Court expressly held that our Supreme Court in *Goode* adopted *Daubert*. *Bates*, 140 N.C. App. at 748, 538 S.E.2d at 600. Accordingly, plaintiff's first argument, insofar as it relies on the trial court's erroneous use of *Daubert*, is without merit.[7]

### III. The Trial Court's Application of *Daubert*

Dr. Howerton claims, even if *Daubert* is the law in this State, the methodology, techniques, and validity[8] of his experts' testimony exceeds even the most stringent *Daubert* scrutiny.

---

7. Dr. Howerton, as well as *amicus curiae*, the North Carolina Academy of Trial Lawyers, contend that North Carolina trial court judges should not be required to perform the *Daubert* gatekeeping function. Specifically, Dr. Howerton contends that:

> Judges are not scientists, bio-mechanical engineers, or doctors. . . . "judges do not have the expertise required to decide whether a challenged scientific theory is correct, and therefore courts [should] defer this judgment to scientists." *State v. Copeland*, 922 P.2d 1304, 1312 (Wash. 1996). This task is particularly daunting in North Carolina where judges still "ride the circuit," have no law clerk, and could be faced with an infinite number of *Daubert* motions each Monday morning.

Although we understand some of the concerns expressed by Dr. Howerton, we, nevertheless, believe that our case law has wisely chosen to place the burden with a lay judge, rather than a lay jury, of initially determining the reliability of expert testimony.

8. We note, that in *State v. Helms*, this court stated that *Daubert* defined " 'reliability' in a legal context [as] 'evidentiary reliability' [which] is 'based upon scientific validity.' " *State v. Helms*, 127 N.C. App. at 380, 490 S.E.2d at 568, *rev'd on other grounds by State v. Helms*, 348 N.C. 578, 504 S.E.2d 293 (1998). Accordingly, scientific validity and evidentiary reliability are equivalent in the context of Rule 702.

## HOWERTON v. ARAI HELMET, LTD.

[158 N.C. App. 316 (2003)]

"[T]he decision on what expert testimony to admit is within the wide discretion of the trial court." *Holland*, 150 N.C. App. at 462, 566 S.E.2d at 93. *See also Bullard*, 312 N.C. at 140, 322 S.E.2d at 376. Under this standard, "[a] trial court may be reversed . . . only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Ward*, 354 N.C. 231, 264, 555 S.E.2d 251, 272 (2001) (citations omitted). Accordingly, having decided that North Carolina has adopted *Daubert*, our review of a trial court's application of *Daubert* is limited to determining whether the trial court abused its discretion. *See Holland*, 150 N.C. App. at 462, 566 S.E.2d at 93; *Cardwell*, 133 N.C. App. at 505, 516 S.E.2d at 395; *see also Joiner*, 522 U.S. at 147.

Dr. Howerton proffered four experts to establish a chain of causation between the alleged defective design of the Arai helmet and his quadriplegia. Professor Hurt's and Mr. Hooper's testimonies were offered to establish that an integrated chin bar would have prevented hyperflexion. Dr. Hutton's testimony was offered to establish that the resulting hyperflexion had a magnifying effect on the compressive force of the injury which retropulsed bone into Dr. Howerton's spinal canal and resulted in quadriplegia. Dr. Rawlings' testimony was offered to establish that Dr. Howerton did not suffer any cervical injuries until his head and neck entered a state of hyperflexion. After making detailed findings of fact, the trial court excluded plaintiff's expert testimony. Dr. Howerton contends the trial court abused its discretion in so finding. We disagree.

First, Professor Hurt testified that Dr. Howerton would not have suffered cervical injuries if his Arai helmet had an integrated chin bar. Professor Hurt testified that he based his opinion on 30 years of experience and, specifically, three motorcycle accidents in which he noticed a "u" or "v" shaped mark on the chests of the respective riders.[9] Professor Hurt deduced from these marks, and the absence of cervical injuries in these riders, that the integrated chin bar prevented hyperflexion of the neck by contacting with the chest.

The trial court, however, found that this testimony was unreliable because Professor Hurt (1) did not test his hypothesis, (2) did not

___

[9]. The trial court, Arai, and Dr. Howerton, note that when asked about the basis of his opinion Professor Hurt replied: "Like Bo knows baseball, Hurt knows motorcycle accidents." The parties debate the significance of this statement, and, whereas Dr. Howerton claims that it was joke, Arai asserts that it demonstrates Professor Hurt's unreliability. In deciding this matter, we have placed little significance on this statement.

subject his hypothesis to peer review, (3) could not quantify the extent, if any, to which a full-face helmet would prevent forward flexion of the neck, (4) could not identify any literature supporting his hypothesis or demonstrating general acceptance of his hypothesis, and (5) published work that actually contradicted his hypothesis. Based on these detailed findings of fact, which are substantially unchallenged by Dr. Howerton, the trial court excluded Professor Hurt's testimony.

Dr. Howerton argues the trial court abused its discretion (that is, excluded the expert without reason) because Professor Hurt's field of expertise, accident reconstruction analysis, is an accepted area of expert testimony in North Carolina. Dr. Howerton contends that "when experts are testifying within their respective, well recognized disciplines, North Carolina law does not require [trial courts] to determine, over and over again, whether the method is reliable."

Indeed, a review of the relevant case law supports the proposition that trial courts are not *required* to test the reliability of expert testimony, where the methodology and techniques of the proffered experts are neither challenged nor novel. However, where the methodology and techniques of the proffered experts are either challenged or novel, the case law does not, in any respect, support the proposition that trial courts are *prohibited* from testing reliability. Any holding to the contrary would require trial courts to admit baseless and unsound opinion testimony simply because a qualified expert, with a degree in a recognized field, offers the opinion. Instead, in North Carolina a trial court's decision to test, or not to test, the reliability of expert testimony proffered by a qualified expert in a recognized area of expertise is reviewed for an abuse of discretion.

In *Davis v. City of Mebane*, 132 N.C. App. 500, 512 S.E.2d 450 (1999), for instance, this Court affirmed a trial court's decision to exclude expert testimony despite the fact that the proffered experts were qualified and testified within a recognized area of expertise. *Id.* at 503, 512 S.E.2d at 453. In *City of Mebane*, plaintiffs alleged that a dam project proximately resulted in recurring flooding and damage. To prove causation, plaintiffs proffered two experts, Dr. Barrett Kays, who held a Ph.D. in soil science and had vast experience and training in ground absorption systems and hydrology, and John Harris, a licensed professional engineer who specialized in hydraulics and had experience designing dams and conducting flood studies.

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

Despite the undisputed qualifications of these experts and the appropriateness and necessity of expert testimony in the relevant field, the trial court excluded the proffered expert testimony because of an absence of reliability. On appeal, plaintiffs argued that: (1) "the methodology underlying the experts' opinion was sufficiently reliable;" (2) "the experts used 'established techniques' and 'conducted significant independent research into the cause of the flooding;' " and (3) "the studies relied upon by plaintiffs' experts were subjected to substantial peer review." Finally, like plaintiff in the case *sub judice*, in *City of Mebane* plaintiffs argued that "the [experts' studies had] sufficient indicia of reliability and any 'perceived flaws in the testimony . . . [were] matters properly to be tested in the crucible of adversarial proceeding; they [were] not the basis for truncating that process." *Id.* at 502, 512 S.E.2d at 452.

It upholding the decision of the trial court to exclude the expert testimony, we noted that an abuse of discretion standard applied and, furthermore, that:

> There [was] evidence in the record to support the trial court's finding. First, defendants' experts . . . testified that Harris' study utilized water flow rates which were based on dramatically different methodology, and that 'it should have been immediately and readily apparent to any competent engineer that any comparison of the water flow rates . . . is invalid and fundamentally flawed, and thus, that any conclusions drawn from such a comparison would be erroneous, misleading and unreliable.' Second, the trial court determined that plaintiffs' experts' opinion that the dam project proximately caused the flooding because the reservoir flood storage capacity was not normal was conclusory because plaintiffs' experts provided no explanation or support for their opinion. . . . Accordingly, we [found] no abuse of discretion.

*Id.* at 503, 512 S.E.2d at 452-53. Thus, in *City of Mebane*, despite the appropriate qualifications and area of expertise, this Court reiterated and affirmed the gatekeeping function of the trial court to exclude unreliable evidence.[10]

---

10. We note, that neither *City of Mebane*, nor the present case, stand for the proposition that trial courts are always required to enter into a protracted analysis of the reliability of conclusions offered by a qualified expert in a recognized field of expertise. Instead, as the United States Supreme Court held in *Joinder*, a trial court is not precluded from undertaking such an analysis because the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joinder*, 522 U.S. at 146.

In the case *sub judice*, it is eminently clear that the trial court's decision to exclude Professor Hurt's testimony was neither arbitrary nor an abuse of discretion. The trial court's findings of fact are reasoned, detailed, and address the relevant inquiries required by *Daubert* and its progeny. Although evidence supporting a contrary conclusion does exist in the record, the record is replete with competent evidence supporting the challenged findings of the trial court. Accordingly, plaintiff's assignments of error are overruled insofar as they challenge the trial court's decision to exclude the causation testimony of Professor Hurt.

Second, Mr. Hooper, a proffered expert in helmet design, testified that a full-face helmet with an integrated chin bar would have prevented plaintiff's quadriplegia. However, the trial court found that Mr. Hooper was not qualified to offer an expert opinion on causation because Mr. Hooper expressly conceded that he did not have the expertise to opine that a full-face helmet with an integrated chin bar would have prevented plaintiff's injury.[11] Based on this finding, standing alone, it is eminently clear that the trial court's decision was neither arbitrary nor an abuse of discretion. Accordingly, this assignment of error is overruled.[12]

Third, Dr. Hutton, an expert in the field of biomechanics, testified that when the Arai helmet's chin guard broke during plaintiff's collision, the lack of support from the broken chin guard allowed plaintiff's head to rotate an extra forty-degrees. According to Dr. Hutton, this additional flexion had a magnifying effect on the compressive force of the injury which retropulsed bone into the spinal canal and resulted in quadriplegia. However, the trial court found that this testimony was unreliable because Dr. Hutton (1) never tested, published, nor researched his hypothesis, (2) conceded that retropulsion of bone fragments can occur in the absence of hyperflexion, (3) conceded that plaintiff could have sustained some degree of retropulsion even if he had been wearing a full-face helmet, and (4) could not

---

11. Like the decision to admit expert testimony, "the decision on who qualifies as an expert . . . is within the wide discretion of the trial court." *Holland,* 150 N.C. App. at 462, 566 S.E.2d at 93.

12. At this point, our analysis could end. Without the testimony of Professor Hurt or Mr. Hooper, Dr. Howerton did not forecast any evidence suggesting that the Arai helmet design was related to hyperflexion. Although the proffered testimony of Drs. Hutton and Rawlings does potentially describe an injury caused by hyperflexion, neither Dr. Hutton nor Dr. Rawlings is qualified to offer an expert opinion pertaining to helmet design. Notwithstanding, we address the trial court's decision to exclude the expert testimony of Drs. Hutton and Rawlings.

**HOWERTON v. ARAI HELMET, LTD.**

[158 N.C. App. 316 (2003)]

identify any literature that supported his hypothesis that plaintiff would not have been paralyzed but for hyperflexion. Furthermore, the trial court noted that Dr. Hutton had not subjected his hypothesis to peer review, and that Dr. Hutton's hypothesis incorporated an unacceptable high rate of error. Based on these detailed findings of fact, which are substantially unchallenged by Dr. Howerton, the trial court excluded Dr. Hutton's testimony. Although evidence in the record does support a contrary finding, it is eminently clear that the trial court's decision was neither arbitrary nor an abuse of discretion. Indeed, the record is replete with competent evidence supporting the challenged findings. Accordingly, this assignment of error is overruled.

Finally, Dr. Rawlings, an expert in neurosurgery, testified that Dr. Howerton did not suffer any cervical injuries, including his paralysis, until his head rotated forward beyond the normal range of motion. However, the trial court found that this testimony was unreliable because Dr. Rawlings (1) did not test his hypothesis, (2) did not subject his hypothesis to peer review, (3) conceded that there are no objective criteria that could be used to confirm his hypothesis, and (4) proffered an hypothesis that was not generally accepted. Furthermore, the trial court noted that Dr. Rawlings conceded that: (1) unless the amount of force in the accident is known, it is impossible to distinguish degrees of flexion, and (2) he did not know the amount of force involved in the accident. Based on these detailed findings of fact, which are substantially unchallenged by Dr. Howerton, the trial court excluded Dr. Rawlings' testimony. Although evidence in the record does support a contrary finding, it is eminently clear that the trial court's decision was neither arbitrary nor an abuse of discretion. Indeed, the record is replete with competent evidence supporting the challenged findings. Accordingly, this assignment of error is overruled.

As Dr. Howerton failed to forecast any admissible evidence on the issue of causation, the trial court properly granted Arai's summary judgment motion with respect to plaintiff's negligence and product liability claims.[13] *See, e.g., Porter v. Fieldcrest Cannon,*

---

13. As an additional ground for granting Arai's summary judgment motion with respect to plaintiff's product liability claims, the trial court held that Dr. Howerton failed to present sufficient evidence to state a *prima facie* claim that Arai unreasonably failed to adopt a safer, feasible design alternative as required under N.C. Gen. Stat. § 99B-6. Dr. Howerton asserts this ruling has no rational basis, because his "entire case is premised upon the failure of Arai to adopt a safer and reasonable design alternative—i.e., a full-face helmet." Dr. Howerton finds support for this proposition in

*Inc.*, 133 N.C. App. 23, 29, 514 S.E.2d 517, 522 (1999) (holding that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury") (citations omitted).

## IV. Unfair and Deceptive Trade

[2] By his final argument, Dr. Howerton claims the trial court erred by granting Arai's summary judgment motion with respect to his claim for unfair and deceptive trade practices. Dr. Howerton asserts that Arai made two claims regarding their helmets which constitute unfair and deceptive trade practices: (1) The Arai helmet was designed to "reduce the possibility of cervical injuries," and (2) The entire Arai helmet was Snell Certified. After carefully reviewing the record, it is clear that Dr. Howerton failed to forecast evidence creating a genuine issue of material fact as to whether these representations were a proximate cause of his injuries. Accordingly, we find no error.

N.C. Gen. Stat. § 75-1.1(a) provides that: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." "To prevail on a claim for unfair and deceptive trade practices, a claimant must demonstrate the existence of three factors: '(1) an unfair or deceptive act or practice . . . (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff . . . .' " *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 9, 472 S.E.2d 358, 363 (1996) (citations omitted). As to the element of proximate cause, this court has consistently held that liability under "Chapter 75 is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation and he or she 'suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.' " *Forbes v. Par Ten Group, Inc.*, 99 N.C. App. 587, 601, 394 S.E.2d 643, 651 (1990) (citation omitted).

---

Professor Hurt's 1981 report which found that: "The increased coverage of the full facial coverage helmet increases protection, and significantly reduces face injuries." The case *sub judice*, however, does not involve facial injuries. Furthermore, on the issue of cervical and neck injuries, Professor Hurt's 1981 report actually concluded that full-face helmet designs were actually associated with neck injuries more often than open-face helmet designs. Accordingly, because Dr. Howerton failed to forecast any evidence of an alterative reasonable design, the trial court had an additional ground for granting summary judgment.

In the case *sub judice,* even assuming that Arai engaged in an unfair and deceptive trade practice in or affecting commerce, the deposition testimony of Dr. Howerton clearly demonstrates that he did not, in fact, detrimentally rely on the assumed misrepresentation.

Q: You had testified the other day that you, based on the ads you had seen, had formed the impression that the Arai helmet was a great helmet . . . . And my question to you is superior in what way?

A. I think my choice was based on aesthetics, [and] who wore the helmet. Those two things.

Q. Did you form any impressions about the mouth or rock guard . . . based on the advertisements that you had viewed?

A. No, sir.

Q. Or judgments about it?

A. No judgments.

Q. When did you first realize that [the rock guard] was an adjustable or removable piece?

A. I knew it was adjustable from the pictures that I had seen of the helmet.

Q. These are before you ever bought it?

A. That's correct.

. . . .

Q. What function did you expect the mouth guard to perform?

A. Protection from falling, protection from debris.

Q. Debris?

A. From the back wheel of other vehicles—other off-road vehicles.

Q. . . . . Protection from falling in what sense? Face plant?

A. It could be a face plant. This is what I thought at the time. Side protection. If I fell from the side, I would expect it . . . the chin or jaw, the mandible.

. . . .

Q. Do you remember seeing ever anything in the [Arai helmet] ads that had to do with the neck?

A. No sir.

. . . .

Q. Did neck protection have anything to do with your purchase of the Arai helmet?

A. I wasn't thinking of neck protection *per se* in purchasing. . . .

Q. And what do you understand the purpose of a helmet to be?

A. Protection of the head area.

. . . .

Q. Before your accident, had you read anything or heard anything from any source concerning whether the Arai . . . helmet might have anything to do with neck injuries, either causing them or preventing them?

A. No, I hadn't read anything.

Despite this testimony, Dr. Howerton argues (1) that he had a pattern and practice of reading all of the ads in "Dirt Rider" magazine, which contained the offending ads, and that he simply did not remember his reliance upon these ads, and, in the alternative, (2) proof of "specific reliance" is not required under Chapter 75, but, instead, "as long as Arai's marketing campaign, taken as a whole, convinced plaintiff that the [Arai] helmet was the functional equivalent of a full-face helmet, then Arai's unfair and deceptive conduct was at least one of the proximate causes of plaintiff's injury." These arguments are without merit. Because plaintiff failed to forecast evidence creating a genuine issue of material fact with respect to proximate causation, the trial court properly granted Arai's summary judgment motion.

Affirmed.

Judges TIMMONS-GOODSON and LEVINSON concur.