Filed 1/9/26  P. v. Thompson CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>RONNELL JAMAL THOMPSON,<br><br>　　　Defendant and Appellant. | B334738<br><br>(Los Angeles County<br>Super. Ct. No. BA490264) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark K. Hanasono, Judge.  Affirmed as modified.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Ronnell J. Thompson appeals from his conviction for second-degree murder and gross vehicular manslaughter. He raises four claims: First, that the trial court abused its discretion by admitting blood alcohol toxicology results from his diagnostic, rather than forensic, blood test. Second, that the court incorrectly instructed the jury regarding implied malice as is required for a murder conviction. Third, that the evidence was insufficient to support second-degree murder. And fourth, that he deserved additional presentence custody credits. We agree that Thompson deserves an additional day of presentence custody credits but otherwise affirm.

## FACTS AND PROCEDURAL BACKGROUND

On October 19, 2019, Thompson's car collided with Diane Wilson Yeboah's van near the 48th Street and Western Avenue intersection in Los Angeles. Thompson drove between 88 and 92.6 mph in a 35-mph zone seconds before the collision, slowed down to between 60 and 73 mph at the point of the collision, and had a blood alcohol content (BAC) between 0.131 and 0.149. Yeboah died four days later from injuries sustained during the collision. The Los Angeles County District Attorney then charged Thompson with murder (Pen. Code, § 187, subd. (a)),[1] gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), driving under the influence of alcohol and driving with a .08 percent BAC, both causing injury within 10 years of another DUI offense (Veh. Code, § 23153, subd. (a)).

Thompson moved pretrial to suppress his toxicology results on the grounds that the evidence was not sufficiently reliable under *People v. Williams* (2002) 28 Cal.4th 408 (*Williams*).

---

[1] Further undesignated statutory references are to the Penal Code.

2

The court held an evidentiary hearing and denied the motion, finding Thompson's argument to be "more properly the subject of a motion to exclude evidence . . . pursuant to Evidence Code [section] 402, rather than a motion to suppress evidence[.]"

Thompson then filed a motion in limine pursuant to Evidence Code section 402 to exclude his toxicology results. The defense argued that the prosecution could not identify who drew Thompson's blood, which meant the blood draw was unreliable, there was no chain of custody for the blood sample, and the prosecution could not establish the foundational requirements to admit the blood test results under *Williams*. The defense did not cite or argue that the evidence should have been excluded under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*). The court held an evidentiary hearing, discussed in more detail below, and denied the motion.

The case proceeded to trial, and the trial evidence established the following. Thompson had been convicted of a previous misdemeanor DUI in 2016. The court there admonished Thompson that he could be charged with murder if he continued to drive under the influence of alcohol and caused someone's death, as required by *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*). Thompson's sentence included participation in both an alcohol and drug program and a victim impact program from Mothers Against Drunk Driving. Both programs included *Watson* admonishments. Thompson was again arrested for driving under the influence in June 2019.[2] After the June 2019 arrest, his license was suspended.

---

[2] Thompson was convicted for driving under the influence for the June 2019 incident, but that conviction occurred after this collision in October 2019.

3

On the date of the collision, Thompson was driving a borrowed car. Meanwhile, Yeboah had picked up her grandson from Ed's Market where he worked as a cashier to drive him home. As Yeboah exited the employee parking lot through an alley, she either stopped or slowed as she approached to make a left on to Western Avenue. As Yeboah's van entered Western Avenue, Thompson's car collided with the van, and the van was then hit by another car. The crash occurred around 8:20 p.m. Yeboah died four days later, and her grandson sustained injuries from the crash.

Thompson was taken to the hospital and had his blood drawn. The nurse that drew Thompson's blood at the hospital did not testify. Instead, the Director of Nursing and Emergency Services at the hospital testified that registered nurses ordinarily drew blood from trauma patients. She also testified to the training and qualifications such nurses received, how registered nurses draw blood from trauma patients, and how blood samples are labeled to ensure they match the correct patient.

The hospital ordered an ethanol (alcohol) test on Thompson's blood at 9:09 p.m. Thompson's blood was then sent to the hospital's internal diagnostic laboratory. The laboratory scientist that performed the analysis did not testify. Instead, the hospital's lab director testified to the licensure, training, and qualifications of the lab personnel. He also testified about how an ethanol test is performed: First, the certified laboratory scientist (CLS) verifies the label to ensure it matches the test order. Second, the CLS places the blood sample vial into a centrifuge that spins the sample to separate the serum (or plasma) from the whole blood sample because the lab's testing machine analyzes blood serum not whole blood. Third, the CLS

4

places the vial into the testing machine and presses a button. The machine then records the intensity of light emitting from an enzymatic reaction on the serum and uploads the results to the patient's medical record. The lab director also testified that the lab conducts daily maintenance on the machine, calibrates the machine, and maintains its licensing as a diagnostic lab.

Thompson's blood serum had 0.164 grams of ethanol per deciliter. The hospital destroyed Thompson's blood sample before it could be tested by a forensic lab. Los Angeles Police Department (LAPD) Criminalist Mandel Medina testified about how to convert that *serum* result into a *whole blood* result, because serum contains a higher concentration of alcohol than whole blood. Using a conversion ratio of 1.10 to 1.25, he testified that Thompson's whole BAC range was 0.131 to 0.149 grams per deciliter, which was over the legal limit of 0.08 grams per deciliter. Medina further testified to his opinion that all drivers with a BAC of 0.08 and above are "too impaired to operate a motor vehicle safely."

Yeboah's blood was collected at the hospital and later tested at LAPD's forensic department following her death. LAPD's certified forensic lab tested her whole blood for ethanol using a forensically approved gas chromatography test. She had a BAC of 0.108 grams per deciliter and a THC level of 0.14 nanograms per milliliter.

LAPD Investigator Brandon Jeon conducted a crash reconstruction. The investigation used the data stored in the event data recorder module of Thompson's car to help determine speed. The data showed that Thompson reached speeds of 88-92 mph roughly four seconds prior to the crash. The data also showed that Thompson's car braked at 3.2, 2.7, and 1.2 seconds

prior to the collision, and there was a sharp turn of the steering wheel to the left during the second braking maneuver.  Finally, the data showed Thompson drove between 60 and 73 mph at the time of the collision.  Jeon opined that speed unsafe for the conditions and violating the speed limit were the primary collision factors.   Previously, LAPD Officer Adam Phillippi conducted a traffic investigation on the night of the collision.  His report concluded that Yeboah's failure to yield to oncoming traffic was a primary cause of the collision, and Thompson's speed was a significant associated factor.  Phillippi did not know the speeds of the vehicles when he prepared his report, and he testified that excessive speed would have been the primary cause of the collision had he known Thompson drove over 88 mph in a 35 mph zone.  Similarly, he testified that had he known Thompson was under the influence at the time of the collision, he would have concluded that played "a very significant role in the collision."

The defense called two witnesses.  The defense's accident reconstructionist agreed this was a high-speed impact and that Thompson exceeded the speed limit.  He nonetheless opined that Yeboah was at fault for failing to yield to oncoming traffic.

The defense's forensic toxicologist testified that hospital labs use enzymatic testing of blood serum to screen for the presence of ethanol but those tests cannot give a definitive answer about the alcohol concentration in the blood.  He testified that forensic toxicologists apply a conversion factor range of 1.18 to 1.21 to convert serum alcohol levels to whole blood alcohol levels, and that he uses the 1.18 conversion factor.  Forensic labs, on the other hand, use gas chromatography with a flame ionization detector to detect ethanol levels in whole blood

6

samples. The results from that test are more reliable and accepted in the scientific community.

The defense toxicologist testified that in this case, a hospital diagnostic lab analyzed Thompson's blood, not a forensic lab. He also testified that he learned hospital staff had cleaned the blood draw site with alcohol contrary to forensic standards. He opined that Thompson's blood test results were unreliable for forensic purposes.

He further testified that failing to yield with a BAC of 0.108 percent and a THC concentration of 14ng/nl reflected impaired driving. He believed that applying the brakes upon seeing an obstruction in the road and turning the steering wheel in an evasive maneuver reflected some level of reactive driving, but acknowledged that a person with a BAC of 0.13 would be impaired.

The jury convicted Thompson of second-degree murder and gross vehicular manslaughter while intoxicated. The jury also found three special allegations were true for the manslaughter conviction: (1) the offense involved great violence, great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; (2) Thompson engaged in violent conduct that indicated a serious danger to society; and (3) Thompson knew his license had been suspended but drove a car while committing the offense. The court sentenced Thompson to 15 years to life on the murder and stayed the sentence on gross vehicular manslaughter pursuant to section 654, which prohibits dual punishments for the same act. (See *People v. Hester* (2000) 22 Cal.4th 290, 294 ["Section 654 precludes multiple punishments for a single act or indivisible course of conduct."].)

7

Thompson timely appealed.

## DISCUSSION

**I.      The Trial Court Acted Within Its Discretion When It Admitted Thompson's Toxicology Results**

Thompson argues the trial court abused its discretion by admitting the hospital's serum blood test results and criminalist's conversion of those results to whole blood because both lacked sufficient reliability.  We disagree.

We review a trial court's ruling to admit evidence for abuse of discretion.  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) " ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " ' " (*People v. Stuart* (2007) 156 Cal.App.4th 165, 179, quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)  To admit testing results, the proponent of the evidence must show "(1) the reliability of the instrument, (2) the proper administration of the test, and (3) the competence of the operator."  (*Williams, supra,* 28 Cal.4th at p. 414, citing *People v. Adams* (1976) 59 Cal.App.3d 559, 567.) "To meet these requirements, the evidence would be admitted upon either a showing of compliance with the title 17 regulations *or independent proof of the three elements*."  (*Ibid.,* italics added.) Contrary to Thompson's argument, compliance with title 17 regulations is not required if the proponent of the evidence otherwise satisfies the criteria identified above.

At the pretrial motion in limine hearing, the prosecution did not call the nurse who drew Thompson's blood or the CLS who placed the blood sample into the hospital's testing machine. Instead, the prosecution called three witnesses: the hospital's Director of Nursing and Emergency Services, the hospital's lab director, and an LAPD criminalist.  The nursing director testified

8

that only registered nurses draw blood from patients on the trauma team. She could not determine from Thompson's medical records who had drawn Thompson's blood the night of the collision. She testified to how registered nurses are trained and hired, how blood is typically drawn from trauma patients, and how the blood sample is then sent to the hospital's lab (either by a pneumatic tube or hand delivered by a trauma team member). She also testified that nurses would ordinarily cleanse the area before drawing blood using isopropyl alcohol, chlorhexidine, or an iodine solution.

The hospital's lab director testified that the operators of his lab's testing machines are all state CLS who are trained in the specific machines they operate. The lab uses an FDA-approved instrument widely used by clinical laboratories to test for ethanol. The machine measures ethanol levels in blood serum, not whole blood, by a colorimetric enzymatic reaction once the sample has been loaded into the machine; it does not require manipulation by the lab technician. He testified that the CLS receives a blood sample, verifies the labeling on the sample is correct, loads the sample into the machine, and presses the start button. From there, the testing machine is automated and reports the results to the patient's records. He also testified to daily quality control measures, that the machine will not report a result if it fails those measures, and about monthly calibrations run on the machine.

The LAPD criminalist testified that BAC can be determined from either a whole blood or a serum test. She testified that the result from a blood serum test could be converted to a whole blood range. She utilizes a conversion factor of 1.1 to 1.125, which is backed by peer-reviewed scientific

9

literature, to make such a conversion. Using that conversion method, she testified that Thompson's blood serum result of 0.164 grams per deciliter converts to a whole blood range of 0.131 to 0.149.

The defense called a forensic toxicologist at the motion in limine hearing. He testified that the hospital's clinical screening test leads to an extreme number of false positives. He described the hospital's testing methodology as a screening test that is not sufficiently reliable for legal proceedings. He also testified that there is no standard conversion from serum to whole blood.

The trial court determined that the prosecution met its burden under *Williams* and *Adams* to admit the blood test results. The court found the operators were competent: a registered nurse performed the blood draw pursuant to hospital protocol, and a CLS trained to use the testing machine performed the analysis. The hospital's testing machine was reliable: the lab performed quality control measures, testing, maintenance, and calibration on the machine. If the machine malfunctions, it sends an error code and stops running the test. No evidence established that the machine was malfunctioning. Finally, the test was properly administered: the machine was largely automated without room for human error, accepted by the scientific or medical community as a reliable method to test blood alcohol levels, and FDA approved and widely used by clinical laboratories.

The court also noted that Thompson's concerns that the use of isopropyl alcohol could affect the testing go to "the weight of the evidence but [do] not preclude its admission."

10

We find the court acted within its discretion when it found the prosecution met the foundational requirements of *Williams* and *Adams*. Neither *Williams* nor *Adams* limits how the prosecution can meet its evidentiary burden nor requires that the operators must themselves testify. The trial court properly exercised its discretion to consider the testimony of the hospital's nursing director and lab director to establish the competence of the nurse who performed the blood draw and the CLS who operated the testing machine. Finally, the trial court acted within its discretion in accepting the reliability of the colorimetric blood serum test over the defense witness's contrary testimony. (*People v. Butcher* (2016) 247 Cal.App.4th 310, 318 ["we do not reweigh conflicting evidence or determine credibility on appeal."].)

This case is thus unlike *People v. Kocontes* (2022) 86 Cal.App.5th 787 (*Kocontes*), on which Thompson relies. In *Kocontes*, the trial court admitted evidence of a victim's blood test based on testimony from a witness who "reviewed the results and stated the testing had been performed in accordance with his training." (*Id.* at p. 861.) The appellate court found this was insufficient evidence to support the foundational requirements of *Williams*, noting the lack of testimony to establish the "machine was functioning properly, the chemist was qualified to operate the machine, and the chemist properly performed the test." (*Kocontes,* at p. 863.) Here, the court heard testimony to establish each of these foundational requirements, and we find no abuse of discretion.

To the extent Thompson raises a claim that the blood test result and conversion should have been excluded under *Kelly, supra,* 17 Cal.3d 24, we find that issue waived because Thompson

11

failed to raise a *Kelly* objection in the trial court. (*People v. Ochoa* (1998) 19 Cal.4th 353, 414 ["Having failed to object on *Kelly*[] grounds to the admission of the evidence . . . , defendant has not preserved his claim."]; *People v. Diaz* (1992) 3 Cal.4th 495, 527-528 [same].)

At trial, the prosecution's criminalist testified to the applicable conversion factor. Thompson did not object to that conversion testimony at trial, nor did his pretrial motion in limine challenge the conversion factor. The defense expert then testified to a similar conversion factor, but notably the defense's conversion factor would have resulted in a *higher* BAC than the prosecution's low-end of the range.

In any event, neither the blood serum test nor the conversion to BAC are new scientific methods subject to *Kelly*. (See *People v. Davis* (2022) 75 Cal.App.5th 694, 711 [*Kelly* test applies only to new scientific techniques].) Indeed, Thompson's own expert testified regarding a serum to BAC conversion factor at trial.

On appeal, Thompson relies on out-of-state authority to argue that other jurisdictions do not generally accept serum testing and conversion to BAC. However, Thompson's authority actually establishes that serum testing is acceptable once converted. (See *State v. Cardwell* (N.C. Ct.App. 1999) 516 S.E.2d 388, 396 [serum testing and conversion acceptable] *People v. Thoman* (Ill. Ct.App. 2002) 770 N.E.2d 228, 231 [conversion factor of serum testing would have been acceptable]; *Commonwealth v. Haight* (Pa. 2012) 50 A.3d 137, 143 [trial court made appropriate conversion to calculate alcohol content in whole blood sample]; *Commonwealth v. Newsome* (Pa. 2001) 787 A.2d 1045, 1049 [serum testing and conversion acceptable].)

Out of state appellate courts overturned the admission of blood alcohol testing only when the serum testing result was presented to the jury without expert testimony converting that result to whole blood.  (E.g. *Newcomb v. State* (Ind. Ct.App. 2001) 758 N.E.2d 69, 72 [conviction for driving with BAC of at least 0.10 percent reversed where prosecution presented no expert testimony converting blood serum figures to whole BAC].)  Thompson has not met his burden to establish the serum testing and conversion should have been excluded under *Kelly*.

## II.  The Trial Court Properly Instructed the Jury on Implied Malice

Next, Thompson contends that the trial court incorrectly instructed the jury on the implied malice requirement for second-degree murder because after his conviction, the California Supreme Court altered the definition of implied malice in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*).  In *Reyes*, decided three months after Thompson's conviction, the Supreme Court concluded that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Id.* at p. 989, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 152.)  Thompson thus contends the trial court's instruction was erroneous.

As a threshold matter, the People argue that Thompson forfeited this challenge because he failed to object at trial.  We find that Thompson did not forfeit his challenge because he contends the instruction incorrectly stated the law.  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012 [forfeiture rule does not apply when "the trial court gives an instruction that is an incorrect statement of the law."].)  Thus, we consider Thompson's

challenge to the instruction, and we review de novo whether a jury instruction accurately describes the law. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218.)

The trial court instructed the jury on the implied malice component of second-degree murder pursuant to the then-applicable standard instruction CALCRIM No. 520.[3] In relevant part, the instruction stated that Thompson must have intentionally committed an act, the natural and probable consequences of the act were dangerous to human life, Thompson

---

[3]     The trial court instructed the jury as follows: "The defendant is charged in Count 1 with murder in violation of Penal Code section 187(a).  To prove that the defendant is guilty of this crime, the People must prove that: Number 1, the defendant committed an act that caused the death of another person.  And Number 2, when the defendant acted he had a state of mind called malice aforethought. . . . The defendant had implied malice if: Number 1, he intentionally committed the act; Number 2, the natural and probable consequences of the act were dangerous to human life; Number 3, at the time he acted, he knew his act was dangerous to human life; and Number 4, he deliberately acted with conscious disregard for human life.  Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.  An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. . . . If you find the defendant guilty of murder, it is murder of the second degree."

knew at the time that the act was dangerous to human life, and Thompson deliberately acted with conscious disregard for human life.  In March 2024, the Judicial Council modified CALCRIM No. 520 after *Reyes*.  The standard instruction on implied malice now states that the defendant intentionally committed an act, the natural and probable consequences of the act were dangerous to human life in that the act involved a high degree of probability that it would result in death, at the time the defendant acted he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for human life.  (CALCRIM No. 520 (2025 edition).)

After briefing was completed here, our colleagues in the Fifth District considered the same challenge and determined that the prior instruction on implied malice remains legally correct.  (*People v. Pierce* (2025) 114 Cal.App.5th 508 (*Pierce*).)  We invited the parties to file supplemental briefing in response to *Pierce*, and each did.

In *Pierce*, the Court of Appeal determined that "*Reyes* did not involve jury instructions or hold that trial courts must instruct that the act required to support a finding of implied malice must involve a high probability that death will result." (*Pierce, supra*, 114 Cal.App.5th at p. 535.)  The court also concluded that "*Reyes* reaffirmed a long line of cases holding that the *Thomas* [act involves a high degree of probability that it will result in death] and *Phillips* [natural and probable consequences of the act are dangerous to life] tests articulate the same standard." (*Pierce,* at p. 535.)

Further, the court noted that prior Supreme Court precedent in *People v. Nieto Benitez* (1992) 4 Cal.4th 91 (*Nieto Benitez*) had considered a similar challenge to an implied malice

15

jury instruction.  As here, the challenged instruction in *Nieto Benitez* did not include the requirement that the defendant act "with a *high probability* that death will result."  (*Id.* at p. 111.) The Supreme Court rejected the challenge, holding that the given instruction " 'correctly distills the applicable case law' " regarding implied malice murder without including that language. (*Pierce, supra,* 114 Cal.App.5th at p. 535, quoting *Nieto Benitez*, at p. 111.)  " '[T]he two linguistic formulations—"an act, the natural consequences of which are dangerous to life" and "an act [committed] with a high probability that it will result in death" are equivalent and are intended to embody the same standard.' " (*Pierce,* at p. 535.)

The *Pierce* court highlighted that *Reyes* neither overruled *Nieto Benitez* nor confronted an instructional issue.  (*Pierce, supra,* 114 Cal.App.5th at pp. 535-536.)  "Because *Reyes* did not decide an instructional issue and did not overrule or disapprove of the high court's prior cases, we are bound by its decision in *Nieto Benitez*."  (*Pierce*, at p. 536.)  While changes made to the standard instruction now incorporate *Reyes*'s language, the prior instruction "remains a correct statement of law."  (*Pierce,* at p. 536.)

We agree with the *Pierce* court's analysis of *Reyes* and *Nieto Benitez*.  *Reyes* dealt with a resentencing petition, not a jury instruction, and did not overrule *Nieto Benitez* expressly or implicitly.  *Reyes* did not hold that the standard instruction given at Thompson's trial misstated the law of implied malice. Thus, we find no legal error in the instruction given at Thompson's trial.

16

## III. The Evidence Was Sufficient to Convict Thompson of Second-Degree Murder

Thompson next argues that the record contains insufficient evidence to support a finding that he acted with implied malice. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hin* (2025) 17 Cal.5th 401, 451.) "[W]e 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302, quoting *People v. Reed* (2018) 4 Cal.5th 989, 1006.) We do not reweigh the evidence or resolve testimonial conflicts at this stage. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We reverse a conviction only if " ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Lattin* (2024) 107 Cal.App.5th 596, 621, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Second-degree murder is the unlawful killing of a human being with malice aforethought. (§§ 187, subd. (a), 189, subd. (b).) Implied malice contains "an objective component (an intentional act endangering the life of another), and a subjective component (knowledge and disregard of the danger)." (*Pierce, supra*, 114 Cal.App.5th at p. 523.) After the Supreme Court held that a defendant who drove under the influence and

17

caused another's death could be charged with second degree murder over forty years ago in *Watson*, appellate courts have upheld these convictions under a "case-by-case" approach. (*People v. Superior Court* (2010) 183 Cal.App.4th 690, 698.) " 'Generally, these opinions "have relied on some or all of the following factors' that were present in *Watson*: (1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." ' " (*Pierce*, at p. 524, quoting *People v. Wolfe* (2018) 20 Cal.App.5th 673, 682-683 (*Wolfe*).)

Thompson initially incorporates his instructional error argument to contend that the jury could not have found the objective component satisfied. We have already rejected that argument. Further, we find that sufficient evidence supports the objective component of implied malice. Thompson drove with a BAC level between 0.13 and 0.14 percent. He exceeded 90 mph in a 35-mph zone, and thus covered the almost 600 feet before the collision in less than half the time it would take a vehicle traveling 35 miles per hour. Even though Thompson slowed down, braked, and turned the steering wheel before the collision, his average speed was still 84 mph during the five seconds before the crash. That meant Yeboah had less time to assess Thompson's incoming speed and to make her turn, and there was testimony that the collision would not have happened had Thompson averaged even double the speed limit at 70 mph during that period. Thus, the evidence presented was sufficient to satisfy the objective component of implied malice, and we find no error.

Sufficient evidence similarly supports the subjective component of implied malice. Thompson had a prior misdemeanor DUI conviction and was arrested for another DUI just four months before this collision. He received *Watson* warnings of the dangers of driving under the influence and the potential murder charge should he do so again from the judge and during his court-ordered programming as part of his prior sentence. (See *Wolfe, supra,* 20 Cal.App.5th at p. 683 [receiving *Watson* warnings allows jury to infer subjective "aware[ness] of the possible lethal consequences of driving under the influence of alcohol."].) He was also driving with a suspended license at the time of this collision.

Further, the fact that Thompson braked just prior to the accident and jerked the steering wheel to the left showed he was actually aware in the moment of the risk of harm his driving created. (See *Pierce, supra,* 114 Cal.App.5th at p. 532 ["our Supreme Court has held that braking immediately prior to a collision may suggest actual awareness of the risk of harm created by a defendant's dangerous driving."].) There was sufficient evidence for the jury to determine that Thompson was subjectively aware his driving was dangerous to the lives of others on the road and he deliberately acted with conscious disregard for their lives.

Thus, we reject Thompson's argument that insufficient evidence supports the jury's finding of implied malice.

## IV. The Trial Court Must Correct the Judgment and Abstract of Conviction to Reflect Thompson's Presentence Credits

Finally, Thompson contends that the parties miscalculated his presentence credits by a day. The People concede error, and

19

we agree. Thompson's presentence credits should have included both the date of his arrest and of his sentencing hearing. (§ 2900.5, subd. (a); *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 ["Calculation of custody credit begins on the day of arrest and continues through the day of sentencing."].) We thus direct the trial court to modify the abstract of judgment accordingly.

## DISPOSITION

The judgment is modified to give Thompson an additional day of presentence custody credit, for a total of 1,114 days. The trial court is directed to amend the abstract of judgment accordingly and forward a copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

UZCATEGUI, J.*

We Concur:

STRATTON, P. J.

VIRAMONTES, J.

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.